UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
PARK IRMAT DRUG CORP.                              :
                                                   :        Index No. 15-CV-08930
                              Plaintiff,            :
                                                   :        (Rakoff, J.)
              - vs. -                               :
                                                   :
OPTUMRX, INC.                                      :
                                                   :
                              Defendant.           :
-----------------------------------------------------------------x

**PLAINTIFF PARK IRMAT DRUG CORP.'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

CONSTANTINE CANNON LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700

Matthew L. Cantor
David A. Scupp
Hamsa Mahendranathan

*Counsel for Plaintiff Park Irmat Drug Corp.*

# TABLE OF CONTENTS

**Page (s)**

PRELIMINARY STATEMENT ......................................................................................1

SUMMARY OF FACTS ...............................................................................................3

    A.        Parties.................................................................................................3

    B.        Irmat builds a successful dermatological pharmaceutical
                practice and mail-order business.............................................................4

    C.        Irmat's contractual relationship with AccessHealth and Optum. ..................5

    D.        Optum terminates Irmat for providing mail-order pharmacy services. ..........6

ARGUMENT ..............................................................................................................8

    I.        Relevant Standards............................................................................8

    II.      Absent an injunction, Irmat will suffer immediate and irreparable harm...........9

    III.     Irmat will likely succeed on the merits. ...............................................10

    A.        Irmat will likely succeed on its breach of contract claim. ...........................10

        1.      Irmat and Optum entered into a contract implied-in-fact
                   under which Irmat has fully performed. ...................................................10

        2.      Optum has breached the parties' contract...................................................11

        3.      Optum waived any purported right to terminate Irmat. ...........................13

        4.      Optum breached the implied covenant of good faith and fair dealing.......13

    B.        Irmat will likely succeed on its equitable estoppel claim. ...........................14

    C.        Irmat will likely succeed on the merits of its tortious interference with
                business relations claim. ....................................................................16

    D.        Irmat will likely succeed on the merits of its antitrust claims. ....................17

        1.      Optum's conduct constitutes an illegal tying arrangement........................17

        2.      Optum and AccessHealth have conspired to unreasonably restrain trade. 19

    IV.     The balance of hardships and the public interest favors granting a preliminary
             injunction. ....................................................................................20

    V.       No Security bond is warranted here.................................................21

CONCLUSION..........................................................................................................22

i

Plaintiff Park Irmat Drug Corp. ("Irmat") respectfully submits this memorandum of law, along with the Declaration of Matthew L. Cantor and attachments thereto, in support of its motion for a temporary restraining order and preliminary injunction.

## PRELIMINARY STATEMENT

Irmat, a licensed pharmacy located in midtown Manhattan, moves to enjoin Defendant OptumRx, Inc. ("Optum"), one of the largest Pharmacy Benefit Managers ("PBMs") in the U.S. with approximately 65 million members, from terminating Irmat from the Optum pharmacy network effective November 30, 2015.[1]  Optum owns a mail-order pharmacy that competes with mail-order pharmaceutical services provided by Irmat.  Optum is attempting to terminate Irmat, in violation of their contractual relationship and tort law, and contrary to equitable principles, for the sole purpose of destroying vibrant competition that Irmat offers to patients, particularly in the dispensation of drugs needed to treat dermatological ailments.  The Court should enjoin Optum from terminating Irmat – a termination that will cause Irmat to go out of business altogether – to ensure that Irmat has an opportunity to pursue its case through trial.

Absent an injunction, Irmat will incur immediate, irreparable harm.  Irmat simply will not be able to continue operating without participating in the Optum network, particularly as (1) Optum sales account for approximately 27% of all the sales that Irmat, a business with only 2.5% profit margins, receives, and (2) Irmat's goodwill with referring dermatologists will dissipate post-termination, as many dermatologists will likely refuse to recommend Irmat to *any* of their patients (both Optum and non-Optum patients).  Dermatologists generally do not refer patients to pharmacies based on the PBM or health plan that covers their medical costs: rather,

---

[1]  PBMs are third-party administrators of prescription drug programs.  PBMs build networks of pharmacies through which PBM members can receive their prescription medications at the "covered" discounted rates.

dermatologists refer to pharmacies that participate in all major health networks and which

provide patients with the best quality service and most competitive prices.  If Irmat is terminated

from Optum, many, if not most, dermatologists will refer all of their patients to pharmacies other

than Irmat that continue to participate in all major PBM and health plan networks.  This will be

devastating to Irmat's business.

Moreover, an injunction should issue because a termination of Irmat by Optum will

violate law.  The ostensible basis for Optum's termination of Irmat is that Irmat has delivered

prescriptions by mail in violation of purported rules that govern membership in Optum's retail

network – rules that Optum had *never* notified Irmat about.  But that is just a pretext.  Optum has

known for years that Irmat has delivered prescriptions outside New York State to Optum

members – approximately **208,000** of them since 2013 – and Optum never argued that Irmat was

in violation of some network rule.  It only notified Irmat of its "violations" once Irmat became a

significant competitor to Optum's mail-order pharmacy.  In reliance on Optum's multi-year

silence and because Optum members demanded it, Irmat continued to dispense tens of thousands

of prescriptions to Optum members by mail order and, indeed, expanded its mail order

operations by incurring million of dollars in sunk costs.  For Optum to now terminate Irmat, after

being silent for so long, would offend well-established principles of equitable estoppel, violate

the principles of good faith and fair dealing embedded in the contract that Optum and Irmat have

created through their course of dealing, tortiously interfere with Optum's prospective business

advantage, and violate the Donnelly Act's prohibitions against illegal tying and actions that

unreasonably restrain trade.

Finally, the balance of hardships and the public interest favor granting an injunction.  The

continued membership of Irmat in Optum networks will cause Optum no harm, whereas Optum's

termination of Irmat will be the death knell of Irmat.  That termination will also cause thousands of patients that frequent Irmat to incur harm.  Many of these patients will lose access to their prescriptions for weeks, if not more, if Irmat is forced to transfer their prescriptions to other pharmacies or they are forced to obtain new prescriptions from their doctors.   And, many of these patients will be forced to make higher insurance co-payments if Irmat is terminated.  Irmat participates in manufacturer reimbursement programs with major dermatological drug manufacturers, Galderma, S.A. ("Galderma"), and Aqua Pharmaceuticals ("Aqua").  Through these programs, patients that need Galderma and Aqua products and purchase them from Irmat have either part or all of their burdensome co-payments covered ███████████.  If Irmat is terminated, many of these patients, including lower income patients that depend on it, will not have ready access to these pharmacy programs and may be unable to afford the medications their doctors prescribe.

For these reasons, and those more fully set forth below, Irmat's motion for a temporary restraining order and preliminary injunction should be granted.

## SUMMARY OF FACTS

For a full recitation of the facts relevant to this motion, the Court is respectfully referred to the accompanying affidavits of Victor Falah, Christopher O'Keefe, and Colleen Kennedy.[2]

### A.    Parties.

Irmat is located at 2 Park Avenue, New York, New York.  It has been a local pharmacy for thousands of New York City residents and commuters since 1978.  Falah Aff. ¶ 12.

 Optum is one of the largest PBMs in the U. S., providing coverage for prescription drugs to over 65 million members.  *Id.* ¶ 8.  PBMs are third-party administrators, responsible for

---

[2]   The Affidavits of Victor Falah, Christopher O'Keefe, and Colleen Kennedy (cited herein as "Falah Aff.," "O'Keefe Aff." and "Kennedy Aff.") are attached to the accompanying Declaration of Matthew L. Cantor.

processing and paying prescription drug claims made by pharmacies and patients. *Id*. PBMs

build networks of pharmacies through which their members receive their prescription

medications at "covered" discounted rates. *Id*. ¶ 9.

Optum also owns and operates a mail-order pharmacy. Falah Aff. ¶ 10.

**B.      Irmat builds a successful dermatological pharmaceutical practice and mail-order business.**

Beginning in 2011, Irmat began to develop a niche practice in the dermatological field.

Falah Aff. ¶ 14.  In 2013 and 2014, Irmat expanded this practice by agreeing to participate in

programs sponsored by dermatological pharmaceutical manufacturers, Galderma and Aqua,

under which ████████████ would sell their products to customers and cover some or all of

the customers' insurance co-payments. *Id*.  Irmat's business increased substantially as a result of

Irmat's developing expertise in dermatological dispensation. *Id*. ¶ 15.  In 2013, Irmat began

filling prescriptions via mail order to meet increased demand. *Id*.

From 2012 to 2015, Irmat's business grew exponentially, both in revenue and geographic

scope.  By way of example, Irmat's revenue from Optum members increased from

approximately $1.99 million in 2012 to a projected $33 million in 2015.  O'Keefe Aff. ¶ 7.

Currently, mail order dispensations account for 80% of Irmat's business.  Falah Aff. ¶ 15.  Sales

to Optum members account for 27% of Irmat's sales.  O'Keefe Aff. ¶ 5.

Irmat's customer base has grown substantially through referrals from dermatologists

whose goodwill Irmat has earned.  Dermatologists generally engage in "one-stop referrals,"

recommending only one or two pharmacies that take all major insurance coverage to their

patients.  O'Keefe Aff. ¶¶ 9-16; Falah Aff. ¶¶ 33-34.  In the third quarter of 2015, approximately

30% of prescriptions that came from Irmat's top 20 physician referrers were for Optum

4

members.  O'Keefe Aff. ¶ 13.  These referrers did not merely refer Optum-covered patients to

Irmat: they referred patients covered by other PBMs, including Express Scripts and CVS Health,

as well.  *Id.*

### C.    Irmat's contractual relationship with AccessHealth and Optum.

Irmat has been a member of Optum's pharmacy network since, at least, 2006.  O'Keefe

Aff. ¶ 3.  On or about July 30, 2012, Irmat enrolled with the Pharmacy Services Administrative

Organization ("PSAO") Strategic Health Alliance II, Inc. d/b/a AccessHealth ("AccessHealth").

Falah Aff. ¶ 17.  Independent pharmacies, such as Irmat, often contract with a PSAO to engage

with the third-party payors on the pharmacy's behalf.  *Id.* ¶ 11.  Irmat enrolled with

AccessHealth to gain continued access to over 100 third-party payor networks, including

Optum's, from which Irmat's customers receive coverage.  *Id.* ¶ 17.  Irmat's contract with

AccessHealth (the "AccessHealth Agreement"), still in effect today, authorizes AccessHealth to

enroll Irmat into the networks of payors, such as Optum.  *See* Falah Aff. Ex. 1 at § 5.1.

Section 2.1 of the AccessHealth Agreemen █████████████████████████████

███████████████████████████████████████████████████████

████████████████████  *See* Falah Aff. Ex. 1 at § 2.1.  Moreover, Section 5.3 of the

AccessHealth Agreemen ███████████████████████████████████████

████████████████████████████████████████████  Falah Aff. Ex. 1 at

§ 5.3.  Irmat was never provided with a written summary of the terms and conditions of any

AccessHealth Payor Agreement with Optum, including the AccessHealth/Optum Payor

Agreement that is currently operative and which first went into effect in February 2015.  Nor was

it provided with any writing noting changes in Optum's operational rules.  Falah Aff. ¶¶ 18, 20.

At the time that Irmat enrolled with AccessHealth in 2012, AccessHealth and Optum

5

were parties to a Prescription Drug Services Agreement. *See* Falah Aff. Ex. 2. That Agreement provided the terms by which AccessHealth's pharmacies (such as Irmat) enrolled in Optum's pharmacy network and furnished prescription drug services to Optum's members. It did not prohibit mail-order pharmacy services except with respect to Medicare Part D patients. *See* Falah Aff. Ex. 2. As a general matter, Irmat does not provide mail-order pharmacy services to Medicare Part D patients. Falah Aff. ¶ 19.

On or about February 10, 2015, approximately two-and-a-half years after Irmat enrolled with AccessHealth, and well after Irmat began its substantial mail-order operations, Optum and AccessHealth entered into a Pharmacy Network Agreement. *See* Falah Aff. Ex. 3. This agreement purported to impose a new restriction upon AccessHealth's pharmacies: that providing *any* mail-order pharmacy services to Optum's customers without Optum's written authorization would constitute grounds for terminatation from the Optum network. *See* Falah Aff. Ex. 3 at §§ 3.10, 5.2.4. Irmat was never provided with notice of this restriction prior to August of this year. Falah Aff. ¶ 20.

**D. Optum terminates Irmat for providing mail-order pharmacy services.**

By letter dated August 10, 2015, Optum demanded that Irmat cease providing mail-order services to Optum's members within ten business days. Falah Aff. Ex. 4. Optum's letter asserted that Irmat's provision of mail-order services violated Optum's February 10, 2015 Pharmacy Network Agreement with AccessHealth, as well as Optum's 2015 Pharmacy Manual. *Id*. Prior to August 10, 2015, Irmat had never been made aware of the existence of Optum's 2015 Pharmacy Manual. Nor had Irmat, prior to that date, ever been (1) notified of the existence of the Pharmacy Network Agreement, (2) provided a summary of its terms, or (3) made aware of the restriction on mail-order distribution. Falah Aff. ¶¶ 18, 20, 23.

6

Since at least 2013, Optum has been well aware that Irmat has shipped prescribed medications to Optum members throughout the U.S., evidencing that Optum acceded to Irmat's mail-order activities regardless of any of its purported network "rules."  Between February 2013 and October 2015, Irmat dispensed approximately 208,000 prescriptions to Optum members nationwide, including tens of thousands of prescriptions to Optum members living in Florida, Texas, Arizona, and California.  O'Keefe Aff. ¶ 7.  Optum reimbursed Irmat for virtually all of the claims that it made with respect to the fulfillment of these prescriptions.  *Id.*[3]

After receiving Optum's cease-and-desist letter, Irmat engaged Optum in an attempt to resolve the matter amicably.  In the course of these discussions, Optum, for the first time in its discussions with Irmat, asserted that it maintained separate networks for "retail" and "mail-order" pharmacies, and noted that Irmat could apply to Optum's mail-order network.  Falah Aff. Ex. 6.  However, Optum maintained that Irmat was prohibited from providing mail-order services while enrolled in Optum's "retail" network.  *Id.*

By letter dated September 28, 2015, Optum informed Irmat that it has terminated Irmat effective November 30, 2015.  Falah Aff. Ex. 8.  Optum's letter noted that Irmat could appeal Optum's termination decision through Optum's internal process.  *Id.*  Irmat did so, submitting a letter and appearing at a telephonic hearing on October 28, 2015.  Falah Aff. ¶¶ 29-31; Exs. 9, 10.

Irmat's appeal letter explained that Optum's conduct violated contract, tort, and antitrust laws and that Optum never provided effective notice to Irmat of its purported prohibition on mail order dispensation by its retail network pharmacies.  Falah Aff. Ex. 10.  Nonetheless, in an effort

---

[3]  AccessHealth, Optum's contractual partner, has known since at least May 29, 2014 that Irmat has been providing significant mail order services.  On that date, AccessHealth was provided with a letter from McKesson (AccessHealth's parent company) that mail-order services constituted 80% of Irmat's business.  Falah Aff. Ex. 12.

to resolve any concerns of Optum, Irmat proposed a way to settle the parties' dispute.  First, Irmat agreed to Optum's proposal to apply for enrollment in Optum's mail-order network.  Second, to avoid irreparable harm to Irmat and substantial harm to Optum members, and to allow for an orderly transition to Optum's mail-order network, Irmat proposed that Optum withhold termination while Irmat completes the application process.  *Id.*

Irmat has already begun to complete the Optum mail order network application process. Optum requires that pharmacies in its mail-order network receive accreditation from the mail-order pharmacy program of the Utilization Review Accreditation Commission ("URAC"). Kennedy Aff. ¶ 2.  According to Imrat's accreditation consultant, the URAC accreditation process typically takes a pharmacy six-to-nine months to complete.  *Id.* ¶¶ 3, 5-11.  However, because Irmat already has in place many of the quality control and oversight functions required by URAC, this will likely only take five-to-six months  *Id.* ¶¶ 4, 11-14.

On November 5, 2015, Optum informed Irmat, in a single page letter that did not address any of the arguments that Irmat had made as part of the Optum appeal process, that its decision to terminate Irmat was affirmed.  Falah Aff. Ex. 11.

## ARGUMENT

### I.     Relevant Standards.

A court may issue a preliminary injunction and temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure.  In the Second Circuit, "A party seeking a preliminary injunction in this circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."  *County of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d

8

Cir. 2008); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995). The standards for

application of a temporary restraining order "are the same standards as those which govern a

preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*,

965 F.2d 1224, 1228 (2d Cir. 1992).

## II.     Absent an injunction, Irmat will suffer immediate and irreparable harm.

"To establish irreparable harm, the movant must demonstrate an injury that is neither

remote nor speculative, but actual and imminent and that cannot be remedied by an award of

monetary damages." *Shapiro*, 51 F.3d at 332 (citation and quotation omitted). "[T]he right to

continue a business . . . is not measurable entirely in monetary terms." *Semmes Motors Inc. v.

Ford Motor Co*., 429 F.2d 1197, 1205 (2d Cir. 1970). "A company's loss of reputation, good

will, and business opportunities from a breach of contract can constitute irreparable harm." *Rex

Med. L.P. v. Angiotech Pharms. (US), Inc*., 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) (finding

irreparable harm if a distributor stopped selling the plaintiff's medical product, and terminating

the supply would force customers to seek out alternative products, resulting in a permanent loss

of that business); *Dunkin' Donuts Inc. v. Albireh Donuts, Inc*., 96 F. Supp. 2d 146, 149 (N.D.N.Y

2000) (finding irreparable harm where the plaintiff alleged, among other things, detrimental

impact on its name and goodwill and loss of business); *Jacobson & Co., Inc. v. Armstrong Cork

Co.*, 548 F.2d 438, 444-45 (2d Cir. 1977) (loss of goodwill could not be remedied by money

damages); *see also Kimm v. Blue Cross & Blue Shield*, 160 Misc.2d 97, 101 (N.Y. Sup. Ct.

1993) (granting preliminary injunction and finding irreparable harm where termination of

plaintiff's insurance contract with defendant could lead to potentially fatal loss of medical care).

Here, termination from Optum's pharmacy network will imperil the viability of Irmat's

business. The loss of sales to Optum members would alone substantially impair Irmat's

business.  O'Keefe Aff.  ¶ 8.  But termination from the Optum network will cause Irmat to lose

substantial sales to non-Optum members as well because many dermatologists will refrain from

recommending Irmat for any of their patients if Optum members cannot have their drug

purchases covered at Irmat  *Id*. ¶ 9-16; Falah Aff. ¶¶ 32-34.  The goodwill that Irmat had

developed over many years with the dermatological community will dissipate quickly if Irmat is

unable to service a substantial share of their patients who are Optum members.

Irmat will not be able to recapture these lost sales even if it were ultimately admitted to

the Optum network at a later date.  This is demonstrated starkly by Irmat's experience with sales

to Georgia customers.  In June 2015, Irmat temporarily ceased providing mail-order services to

customers in Georgia due to a newly enacted Georgia state licensing requirement.  O'Keefe Aff.

¶ 14-15.  When Irmat obtained its Georgia license and resumed providing mail-order services to

customers in the state in August 2015, however, the vast majority of dermatologists that had

previously referred patients to Irmat did not revert back to doing so.  *Id*. ¶ 16.

**III.    Irmat will likely succeed on the merits.**

**A.    Irmat will likely succeed on its breach of contract claim.**

"To establish a breach of contract claim under New York law . . . a plaintiff must prove:

'(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3)

breach of contract by the defendant, and (4) damages.'" *Air Italy S.p.A. v. Aviation Techs., Inc.*,

2010 U.S. Dist. LEXIS 73221, at *8 (E.D.N.Y. July 21, 2010).  There is a substantial likelihood

that Irmat will succeed on the merits of its breach of contract claim.

**1.    Irmat and Optum entered into a contract implied-in-fact under which
Irmat has fully performed.**

Irmat and Optum entered into a contract whereby Irmat enrolled in Optum's pharmacy

network, and Optum reimbursed Irmat for pharmaceutical sales to Optum members. "[I]t is well settled that a contract may be implied in fact where inferences may be drawn from the facts and circumstances of the case and the intention of the parties as indicated by their conduct." *In re Boice*, 226 A.D.2d 908, 910 (3d Dep't 1996). "A contract implied in fact rests upon the conduct of the parties and not their verbal or written words." *Watts v. Columbia Artists Mgmt., Inc.*, 188 A.D.2d 799, 801 (3d Dep't 1992). *See also Deerkoski v. E. 49th St. Dev. II, LLC*, 120 A.D.3d 1387, 1388 (2d Dep't 2014) (finding implied-in-fact contract "based on evidence that the plaintiff performed services which were accepted" by counterparty).

Since at least July 30, 2012, when Irmat enrolled with AccessHealth, Irmat and Optum have formed an implied-in-fact contract through the parties' extensive business dealings. The relevant terms of the contract are straightforward: Irmat would enroll in Optum's pharmacy network, provide pharmacy services to Optum's members, and comply with those "operational and procedural rules and regulations," of which Irmat was given effective, written notice. *See* Falah Aff. Ex. 1 at §§ 2.1, 5.1, 5.3. In return, Irmat would receive reimbursement from Optum for drugs that it dispensed to Optum's members. The parties' course of conduct demonstrates that both Optum and Irmat assented to this contract and to these terms.

There is no question that Irmat performed according to its implied-in-fact contract with Optum. Since 2012, Irmat has submitted reimbursements to Optum directly, and Optum has reimbursed Irmat for tens of millions of dollars in pharmaceutical sales. O'Keefe Aff. ¶ 7.

### 2.    Optum has breached the parties' contract.

Optum's termination of Irmat on the purported basis that Irmat provides mail-order pharmacy services is a breach of the parties' contract. Irmat never agreed to refrain from providing mail-order pharmacy services to Optum members, and never agreed that doing so

11

would constitute grounds for termination.

Nor was Optum's prohibition on providing mail-order pharmacy services incorporated by reference into the AccessHealth Agreement.  For the terms of an extrinsic document to be incorporated by reference in a contract, the "reference must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt."  *Chiacchia v. Nat'l Westminster Bank*, 124 A.D.2d 626, 628 (2nd Dep't 1986); *Shark Info. Servs. Corp. v. Crum & Forster Commercial Ins.*, 222 A.D.2d 251, 252 (1st Dep't 1995) ("Incorporation by reference, of course, is appropriate only where the document to be incorporated is referred to and described in the instrument as issued so as to identify the referenced document beyond all reasonable doubt.") (internal quotation marks omitted).

Irmat's contract with AccessHealth did not identify the Pharmacy Network Agreement or the 2015 Pharmacy Manual "beyond all reasonable doubt."  Rather, the AccessHealth Agreement did not identify them at all.  *See* Falah Aff. Ex. 1.  When Irmat enrolled with AccessHealth on July 30, 2012, the contract that was in effect between Optum and AccessHealth only prohibited pharmacies from providing mail-order services to Medicare Part D patients.  Falah Aff. Ex. 2.  As a general matter, Irmat does not provide mail-order pharmacy services to Medicare Part D patients.  Falah Aff. ¶ 19.  It was not until February 10, 2015, that Optum purported to bar pharmacies from providing *any* mail-order services to Optum members.  Irmat was never provided effective notice of this new prohibition and certainly never consented to it.  Irmat cannot therefore be bound to this new prohibition.  *See* Falah Aff. Ex. 1 at § 5.3

█████████████████████████████████████████████████████████

███████████████████████████████████████

### 3. Optum waived any purported right to terminate Irmat.

Even if Optum had any valid right to terminate Irmat for providing mail-order pharmacy services, Optum waived that right by "knowingly, voluntarily, and intentionally abandoning" it. *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt.*, L.P., 7 N.Y.3d 96, 104 (2006). Waiver is the result of a "clear manifestation of intent to relinquish a contractual protection." *Id*. (internal quotation marks omitted).

Since late 2013, Irmat's mail-order pharmacy operations have been well known to Optum.  In fact, in the last three years Irmat's revenue from Optum members increased from approximately $1.99 million to a projected $33 million (for 2015) due in large part to Irmat's mail-order business.  *See* O'Keefe Aff. ¶ 7.  Irmat has filled approximately ***208,000*** prescriptions for Optum members throughout the country between February 2013 and October 2015 including tens of thousands of prescriptions to Optum members residing as far away as Florida, Texas, Arizona and California.  *Id*.  Despite its knowledge of Irmat's mail-order dispensations, Optum continued to reimburse Irmat for nearly two years without protest.  Optum's conduct amounts to a knowing, voluntary, and intentional waiver of any purported right to terminate Irmat for providing mail-order pharmacy services to Optum members.  *See Lee v. Wright*, 108 A.D.2d 678, 680 (1st Dep't 1985) ("Knowing acceptance of rent without any effort to terminate the lease justifies the inference that the landlord has . . . waived any violation.").

### 4. Optum breached the implied covenant of good faith and fair dealing.

Optum's termination of Irmat also constitutes a violation of the implied covenant of good faith and fair dealing.  "Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance."  *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). "Encompassed within the implied obligation of each promisor to exercise good faith are any

promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Id.* This includes a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (1933); *see also Outback/Empire I, Ltd. P'ship v. Kamitis, Inc.*, 35 A.D.3d 563, 563 (2d Dep't 2006) ("[A]lthough certain provisions allowed the plaintiff, in its sole and absolute discretion, to terminate its obligations under the lease, the plaintiff was required to carry out its contractual obligations incident to the exercise of its discretion in good faith.").

Here, Optum's conduct violates Optum's good faith obligation to refrain from acting in a manner that deprives Irmat of the benefit of the parties' bargain. When Irmat enrolled with AccessHealth in July 2012, Optum's rules contained no prohibition on providing mail-order pharmacy services (other than to Medicare Part D patients). Irmat had every right to grow its business through mail-order operations. It did so, expending large sums on now sunk costs, and its business thrived. When Optum purported to enact a blanket prohibition on providing mail-order pharmacy services in February 2015 without seeking Irmat's consent or even providing notice to Irmat, Optum acted in bad faith. When Optum ordered Irmat to cease providing mail-order services within an unreasonable 10-day window or face termination, Optum acted in bad faith. And, when Optum terminated Irmat, despite Irmat's acceptance of Optum's offer to apply to its "mail-order pharmacy network," Optum acted in bad faith. Optum's conduct violates its implied covenant of good faith and fair dealing with Irmat.

    **B.**    **Irmat will likely succeed on its equitable estoppel claim.**

Optum is equitably estopped from terminating Irmat on the purported basis that Irmat provides mail-order pharmacy services. "It is imposed by law in the interest of fairness to

prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought." *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982); *see also Besicorp Grp. v. Enowitz*, 235 A.D.2d 761, 764 (3d Dep't 1997) (Equitable estoppel is defined as "[t]he doctrine by which a person may be precluded by his act or conduct, or silence when it is his duty to speak, from asserting a right which he otherwise would have had.") (internal quotation marks omitted); *Kimm*, 160 Misc.2d at 102-05 (granting preliminary injunction to equitably estop insurance company from terminating coverage).

From the time that Irmat began its substantial mail-order business in 2013, Optum knowingly and consistently reimbursed Irmat for its mail-order sales to Optum members. *See* O'Keefe Aff. ¶ 7. Those reimbursements amounted to tens of millions of dollars since 2013. *Id*. At no time prior to sending its cease-and-desist letter in August 2015 did Optum notify Irmat that Irmat's mail-order operations were purportedly barred by Optum's rules. Falah Aff. ¶ 23. Optum's actions prior to August 2015 led Irmat to believe that it would gain substantial goodwill from physicians throughout the country by being able to service Optum members via mail order dispensation. It also led Irmat to believe that the time, money and labor that it expended on its mail-order operations would ultimately pay off through reimbursements that Irmat gained by servicing Optum member and other customers. Irmat relied on Optum's conduct to Irmat's detriment.

As explained above, since 2013, Irmat expanded its business far beyond its Park Avenue storefront. Irmat increased its workforce from 20 to 208 employees. Falah Aff. ¶ 16. Irmat has spent millions of dollars to expand its current office space in Manhattan as well as build a call

15

center in Brooklyn, New York.  O'Keefe Aff. ¶ 17; Falah Aff. ¶ 16.  If Irmat is terminated from

Optum's network, it will lose substantial goodwill in the dermatological community and be

unable to sustain its business as it is constituted today.  Optum should therefore be equitably

estopped from terminating Irmat on the purported basis that Irmat provides mail-order services.

      **C.**      **Irmat will likely succeed on the merits of its tortious interference with business relations claim.**

Optum's conduct constitutes tortious interference with Irmat's business relations.  "To

prevail on a claim for tortious interference with business relations in New York, a party must

prove (1) that it had a business relationship with a third party; (2) that the defendant knew of that

relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice

or used improper or illegal means that amounted to a crime or independent tort; and (4) that the

defendant's interference caused injury to the relationship with the third party."  *Amaranth LLC v.*

*J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 47 (1st Dep't 2009).

Presently, Irmat has business relations with thousands of customers, numerous

dermatologists, and prominent drug manufacturers, including Galderma and Aqua.  Optum is

well aware of Irmat's business relationships.  *See supra* § III.A.3.  Terminating Irmat from

Optum's network will interfere with those relationships.  *See supra* § II.  Dermatologists will

cease to recommend Irmat to their patients if Irmat cannot service Optum's 65 million members.

*See supra* § II.  And, manufacturers will not likely want to continue their partnerships with Irmat

if it cannot participate in the Optum network.  Further, Optum's termination of Irmat is not in its

member's interests (Irmat is very popular with Optum members), or in pursuit of legitimate

business objectives.  Rather, Optum will terminate Irmat merely to eliminate a competitor in

violation of  antitrust law.  Irmat will likely succeed on its tortious interference claim.

**D.      Irmat will likely succeed on the merits of its antitrust claims.**

Irmat is likely to succeed on the merits of its Donnelly Act antitrust claims.[4]

**1.      Optum's conduct constitutes an illegal tying arrangement.**

Optum has forced its pharmacies that participate in Optum's "retail" pharmacy network to refrain from providing mail-order pharmacy services.  This constitutes an illegal tying arrangement that violates antitrust law *per se*.  *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9 (1984) ("certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable *per se*."); *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335 (1988) (The Donnelly Act "should generally be construed in light of Federal precedent . . . .").  Courts have held that such "negative" tying arrangements can violate antitrust laws. *See, e.g., RealPage, Inc. v. Yardi Sys.*, 852 F. Supp. 2d 1215, 1222 (C.D. Cal. 2012); *Image Tech. Serv. v.Eastman Kodak Co.*, 903 F.2d 612, 615 (9th Cir. 1990).[5]  To prove a *per se* illegal tying arrangement, the plaintiff must satisfy the following elements: (1) that the tying arrangement affects a substantial amount of interstate commerce, (2) the [tying and tied] products are distinct, (3) the defendant actually tied the sale of the two products; and (4) the seller has appreciable market power in the tying market."  *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 133, n.5 (2d Cir. 2001) (Sotomayor, J.).  Irmat will likely satisfy all of these elements, as follows.

---

[4]  The Donnelly Act prohibits "[E]very contract, agreement, arrangement or combination whereby [a] monopoly . . . is or may be established or maintained, or whereby [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service . . . is or may be restrained."  N.Y. Gen. Bus. Law § 340(1).

[5]  The Donnelly Act prohibits anticompetitive tying arrangements.  *See, e.g., Big Top Stores, Inc. v. Ardsley Toy Shoppe, Ltd.*, 64 Misc.2d 894, 905 (N.Y. Sup. Ct. 1970) (holding that tying arrangement in violation of the Sherman Act "must also be held to violate the Donnelly Act").

17

- The evidence demonstrates that the tying arrangement impacts a "substantial amount of commerce." It is projected that Irmat's sales merely to Optum members this year by mail order will comprise tens of millions of dollars of reimbursement revenue. That is more than enough to satisfy this element. *See supra* Stmt. of Facts § B; *United States v. Loew's, Inc.,* 371 U.S. 38 (1962) (approximately $60,000 in tied product sales constitutes a substantial amount of commerce on tying claim).

- The evidence shows that Optum has forced all pharmacies enrolled in Optum's retail pharmacy network to refrain from providing mail-order pharmacy services to Optum members. Optum has enforced this prohibition by threatening to terminate, and actually terminating, pharmacies that refuse to yield to Optum's prohibition. Falah Aff. ¶¶ 22-31.

- Irmat will show that the "tying" product in this case is distinct from the tied product in this case, e.g., the provision of retail pharmacy services to Optum members. "The question" of whether the alleged tying and tied products are distinct, "turns not on the functional relation between them, but rather on the character of the demand for the two items." *Jefferson Parish,* 466 U.S. at 19. Here, the demand for retail pharmacy services is quite distinct from the demand for mail order pharmacy services. Retail pharmacy services are provided by pharmacies to customers via traditional brick-and-mortar storefronts. The services are generally provided face-to-face between the customer and a pharmacist. Falah Aff. ¶ 10. Medications are typically obtained by customers at the store-front, rather than through home deliver by mail carrier. Falah Aff. ¶ 10. To the contrary, mail-order pharmacy services to Optum members are not provided in a face-to-face visit, as consumers, particularly those that live in rural areas, often do not live within close proximity to a brick-and-mortar "retail" pharmacy that can provide the prescribed medication. Falah Aff. ¶ 10. For these consumers, mail-order pharmacies are the only reasonable means of purchasing their medications. Falah Aff. ¶ 10. In addition, retail pharmacies generally do not provide the same level of convenience to pharmacists that mail-order pharmacies, like Irmat's, can provide. Falah Aff. ¶ 10.

- Optum has market power in the "tying" market for retail pharmacy services to Optum members.[6] Optum alone has the authority to decide which pharmacies

---

[6]   Courts have held that "single brand" markets, such as a market for Optum network participation, exists, particularly where consumers, like Optum members, are locked into using the single brand. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (reversing summary judgment to defendant on issue of whether single brand markets exist for parts and services for Kodak copiers).

18

will be eligible to receive reimbursement for prescription sales to Optum's 65 million members.  Hundreds, if not thousands, of retail pharmacies in the United States that are enrolled in Optum's retail network are thus forced to forego providing pharmacy services by mail order to Optum members.  *See Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969) ("[T]he proper focus of" the market power inquiry concerns "whether the seller has the power to raise prices, *or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.*")

> **2.      Optum and AccessHealth have conspired to unreasonably restrain trade.**

By agreeing to terminate Irmat and any other pharmacy in Optum's retail network that provides mail order services from participating in any Optum network, Optum and AccessHealth have engaged in a "contract, agreement, arrangement or combination" restraining competition in violation of the Donnelly Act.  To prove a violation, "a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade."  *Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 506 (2d Cir. 2004).

Here, Optum and AccessHealth are two distinct economic entities that are parties to a Pharmacy Network Agreement.  That Agreement unreasonably restrains trade in the market for mail-order pharmacy services to Optum members.  It purports to allow Optum to terminate any pharmacy enrolled with AccessHealth on the basis that the pharmacy provides mail-order pharmacy services to Optum members without Optum's prior written authorization.  *See* Falah Aff. Ex. 3.  This Agreement has provided Optum with the means by which it has foreclosed competitive pharmacies enrolled with AccessHealth from the relevant market.[7]

---

[7]   The agreement between Optum and AccessHealth is a *per se* illegal group boycott.  *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293-94 (1985).  However, even if Optum and AccessHealth's agreement were to be analyzed under the Rule of Reason, there is no offsetting, pro-competitive business justification for Optum and AccessHealth to exclude a pharmacy such as Irmat from the relevant market.

**IV.      The balance of hardships and the public interest favors granting a preliminary injunction.**

Alternatively, where a Court finds a movant has not demonstrated a likelihood of success on the merits, it may still be entitled to injunctive relief where it demonstrates "the existence of sufficiently serious questions to make them a fair ground for litigation and a balance of hardships tipping decidedly in [its] favor." *American Cash Card Corp. v. AT&T Corp.*, 1995 U.S. Dist. LEXIS 18880 at *6 (S.D.N.Y. Dec. 21, 1995).  Indeed, "where the balance of hardships tips decidedly toward the party requesting the temporary relief" the burden on the movant in this regard is "less." *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 692 (2d. Cir. 1973) (citing *Dino De Laurentiis Cinematografica, S.p.A. v. D-150, Inc.*, 366 F.2d 373, 375 (2d Cir. 1966)).

The balance of the hardships strongly favors granting a preliminary injunction.  The harm that Irmat would suffer absent a preliminary injunction far outweighs the harm Optum would suffer should the court grant Irmat's motion.  If the injunction were denied, Irmat would suffer the ultimate harm: it would be forced out of business.  On the other hand, Optum would suffer no discernible injury if the injunction were granted.

The enormous public interests involved here also favor granting a preliminary injunction. *See Innovative Health Sys. v. City of White Plains*, 931 F. Supp. 222, 228, 244-45 (S.D.N.Y. 1996), *aff'd* 117 F.3d 37 (granting motion for preliminary injunction to prevent interference with treatment of patients and finding balance of hardships favoring plaintiffs) .  Upon termination, Irmat would no longer be able to provide medically necessary medications to the tens of thousands of patients it has been continually servicing.  Falah Aff. ¶ 36-38.  Termination would require each patient to

---

*See* Falah ¶¶ 24 (noting that Irmat is licensed by virtually all U.S. states and is in compliance with all relevant regulations); Kennedy Aff. ¶¶ 11-14 (Irmat likely to receive URAC accreditation in a few months).

obtain services from a new pharmacy, likely resulting in the need for a new physician

prescription, which could take several weeks to obtain.  *Id.* ¶ 39 (identifying the wait time for

gaining appointments with dermatologists and the delay that can be caused by pre-authorization

process).

       Alternatively, Irmat would be required to transfer prescriptions to another pharmacy.

Falah Aff. ¶ 40.  The law requires such a transfer to occur through a pharmacist-to-pharmacist

communication.  Falah Aff. ¶ 40.  It would take weeks, if not months, to transfer the 11,000

prescriptions per month that Irmat fills for Optum members to another pharmacy.  *Id.* ¶¶ 40-42.

       In addition, Irmat has many local retail customers that have been receiving pharmacy

services from Irmat for decades, including many elderly patients.  Falah Aff. ¶ 44.  These

customers rely on Irmat's intimate knowledge of their medical conditions and necessary

prescriptions in order to obtain fast and reliable pharmacy services.  *Id.* ¶ 44.  These customers

simply cannot obtain comparable service from any other pharmacy because that pharmacy would

lack the knowledge that Irmat has acquired over decades of servicing the customer, and may not

carry some of the less-common medications Irmat carries.  *Id.* ¶ 44.  These customers would be

devastated if Irmat went out of business.

       Granting an injunction would protect the public interest.

**V.**      **No security bond is warranted here.**

       Fed. R. Civ. P. 65 provides that "[t]he court may issue a preliminary injunction or a

temporary restraining order only if the movant gives security in an amount that the court

considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined or restrained."  However, the district court, in its discretion, is free to decide

that, under the circumstances, no security is required.  *Corning Inc. v. PicVue Electronics, Ltd.*, 365

F.3d 156, 158 (2d Cir. 2002).  Where, as here, there has been no proof of likelihood of harm on the Defendant, the Court may dispense with the bond requirement. *See Corning Inc*, 365 F.3d at 158; *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (district court did not abuse discretion by entering injunctions without requiring posting of bonds).  Here, as explained above allowing Irmat to remain in Optum's network will not harm Optum in any discernible way. *Supra* § IV.  Since there is no risk of injury to Optum from the issuing of a preliminary injunction, no security bond is warranted.

## CONCLUSION

For the reasons set forth above, Irmat respectfully requests this Court grant Irmat's motion for a temporary restraining order and preliminary injunction.

Dated: New York, New York
November 13, 2015

CONSTANTINE CANNON LLP

By: _____
Matthew L. Cantor
David A. Scupp
Hamsa Mahendranathan
335 Madison Avenue
New York, New York 10017
(212) 350-2700

*Counsel for Park Irmat Drug Corp.*