SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PARK IRMAT DRUG CORP.,

    Plaintiff,

  - vs. -

OPTUMRX, INC.

    Defendant.

Index No. _____

---

### AFFIDAVIT OF CHRISTOPHER O'KEEFE IN SUPPORT OF PLAINTIFF PARK IRMAT DRUG CORP.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**(Memorandum of Law in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction submitted concurrently herewith)**

STATE OF NEW YORK )
         ) ss:
COUNTY OF NEW YORK )

Christopher O'Keefe hereby states that the following is true under penalty of perjury:

  1.  I am the Chief Operating Officer of Plaintiff Park Irmat Drug Corp. d/b/a Irmat Pharmacy ("Irmat"). I submit this Affidavit in support of Irmat's Motion for a Temporary Restraining Order and a Preliminary Injunction enjoining Defendant OptumRx, Inc. ("Optum") from terminating Irmat from its pharmacy network during the pendency of this lawsuit. If called and sworn as a witness in this case, I could and would testify competently to each and every statement in this affidavit, all of which have been made based upon my personal knowledge

  2.  This affidavit is submitted to provide the Court with information concerning Optum's recent decision to terminate Irmat from participating in Optum's pharmacy networks

1

effective November 30, 2015, and to describe the deleterious effect that termination will have on Irmat's ability to continue operations post-termination.

**Optum Was Well Aware of Irmat's Mail-Order Dispensing**

3. Irmat has been a member of Optum's pharmacy network since, at least, 2006. In 2012, Irmat continued to participate in Optum's network after enrolling in AccessHealth's Pharmacy Services Administrative Organization.

4. Between 2013 and 2014, due to the development of a niche pharmaceutical practice in the dermatological field, Irmat's business increased exponentially.

5. Today, Irmat fills approximately 11,000 prescriptions per month for Optum members nationwide. Moreover, Optum accounts for approximately 27% of Irmat's sales, for both medications dispensed at Irmat's retail storefront at 2 Park Avenue, New York, New York, and through courier services nationally.

6. Optum sent correspondence dated August 10, 2015, and September 28, 2015 to Irmat (attached as Exhibits 4 and 8 to the accompanying Affidavit of Victor Falah) stating that Irmat has violated Optum rules by dispensing prescription drugs via mail-order to Optum members nationwide. This is the ostensible basis for Optum's termination of Irmat.

7. However, since at least 2013, Optum has been well aware that Irmat ships prescribed medications to Optum members throughout the United States. Between February 2013 and October 2015, Irmat dispensed approximately **208,000** prescriptions to Optum members nationwide, including to Optum members as far away as Florida (12,508 prescriptions), Texas, (8,937 prescriptions), Arizona (8,885 prescriptions), and California (8,624). Moreover, Optum has reimbursed Irmat for virtually all of the claims that Irmat has made to Optum directly with respect to the dispensation of these prescriptions. Irmat's revenue from Optum members

increased from approximately $1.99 million in 2012, to $3.8 million in 2013, to $15.3 million in 2014, to a projected $33 million in 2015. Yet, Irmat's retail brick-and-mortar operations have remained at the same storefront where Irmat has operated since 1978. Accordingly, as the pharmacy benefit manager ("PBM") that processes Irmat's claims and provides reimbursement for services rendered to Optum patients, Optum was fully aware that Irmat was shipping medications to patients throughout the country well before first claiming, in August 2015, that Irmat was in violation of Optum's purported rules barring mail fulfillment services.

**Termination from Optum's Network Will Threaten the Viability of Irmat's Business**

8. Optum's termination of Irmat from its pharmacy network will imperil Irmat's ability to continue its pharmacy operations. Irmat is a low margin business: it has a net profit margin of only 2.5%. Losing 27% of its sales from an Optum termination would be catastrophic.

9. The economic consequences of an Optum termination of Irmat, however, go far beyond the loss of sales to Optum members. Termination will substantially impact Irmat's sales to non-Optum members as well. Irmat relies on dermatologist referrals in order to attract business. Those referrals have been earned as a result of the valued customer service and expertise in dermatological drugs that Irmat has provided patients. Irmat has earned substantial goodwill in the dermatological community through its hard work and commitment to quality.

10. If Irmat is terminated from Optum's network, the goodwill that Irmat has earned, and the referrals that are provided to Irmat as a result of this goodwill, will be compromised. That is because many, if not most, dermatologists whose patients are serviced by Irmat have been referred to Irmat regardless of whether those patients are Optum members.

11. Irmat's experience demonstrates that dermatologists do not make a referral to any particular pharmacy (not owned by a PBM) based on the PBM that covers their services: rather,

referring dermatologists expect that the referred to pharmacy will be enrolled in major PBM networks. Moreover, our experience shows that many, if not most, dermatologists engage in 'one stop referrals,' recommending only one or two pharmacies that take all major insurance coverage to their patients.

12. A pharmacy that cannot obtain reimbursement from Optum, which I understand covers over 65 million individuals nationwide, would likely be unable to service a substantial number of any given dermatologist's patients. We therefore expect that many referring dermatologists will no longer recommend patients frequent Irmat if Irmat is terminated from Optum. Irmat's business would suffer, should that occur, regardless of the pharmacy networks that Irmat would still participate in post-Optum termination.

13. The 'one stop referral' phenomenon is also evidenced by Irmat referral data. In the third quarter of 2015, approximately 30% of prescriptions that came from Irmat's top 20 physician referrers were for Optum members. The remaining majority of prescriptions coming from these physician referrers were for patients covered by the two other significant PBMs, Express Scripts and CVS Health. This shows that these referrers did not merely refer Optum-covered patients to Irmat, but patients covered by other insurance as well. As explained above, termination from Optum's pharmacy network would severely jeopardize sales to patients covered by these other major PBMs.

14. Irmat's experience also shows that once a dermatologist begins referring patients to a pharmacy that can fulfill prescriptions for patients covered by any major PBM or health plan, the dermatologist does not refer business to other pharmacies. A specific example from Irmat's recent history concerning its dispensation of drugs to Georgia consumers evidences this 'one stop referral' phenomenon.

4

15. The State of Georgia recently revised its pharmacy rules to require non-resident pharmacies to obtain a license to dispense medications to Georgia residents, whereas such license was not previously required. Prior to needing a license in Georgia, Irmat filled approximately 2,500 prescriptions for Georgia residents on a monthly basis. In June 2015 Irmat cease mailing pharmaceuticals to Georgia while Irmat obtained its license. Irmat resumed mailing to Georgia patients in August 2015, after receiving its Georgia license.

16. During the two months when Irmat could not serve Georgia residents, physicians in Georgia that had referred patients to Irmat found alternative pharmacies to recommend. After Irmat received its Georgia license, most of these physicians did not revert back to referring patients to Irmat. In the two months after obtaining its Georgia pharmacy license, Irmat's monthly prescription fills for Georgia residents is only 20% of its previous Georgia patient volume.

17. Irmat will also be harmed by an Optum termination because it has made substantial investments into expanding its business. As neither Optum nor any other major PBM had ever claimed that Irmat violated any of its rules or regulations or threatened to terminate Irmat prior to August 2015, Irmat had no reason to believe it would be inhibited from growing its business through mail-order operations. To accommodate its increasing operations in the dispensing of dermatological medications, Irmat has spent significant capital to expand its current office space in Manhattan as well as build a call center in Brooklyn, NY. The expenditures to date on the build-out of Irmat are approximate $2.1 million, with anticipated future costs of $1.1 million to complete construction of the Brooklyn facility. The inability to service Optum patients will obviate the need for this facility and will result in a loss of over $3 million committed to expanding Irmat's business.

Dated: November 12, 2015
      New York, New York

                                                            _____
                                                               CHRISTOPHER O'KEEFE

Sworn to before me on November 12th, 2015

_____
Notary Public State of New York

                                SOBEIDA BATISTA
                   Notary Public, State of New York
                            No. 01BA6303361
                         Qualified in Bronx County
                 My Commission Expires 08/04/2018