UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

PARK IRMAT DRUG CORP.,

Civil Action No. 15-cv-8930 (JSR)

Plaintiff,

-against-

**DOCUMENT
ELECTRONICALLY FILED**

OPTUMRX, INC.,

**DECLARATION OF
KERRI TANNER**

Defendant.
-------------------------------------------------------------X

KERRI TANNER, pursuant to 28 U.S.C. §1746(2) declares the following under penalty of perjury:

1.       Since March 2015, I have been employed as Vice President, Pharmacy Network Management, initially for Catamaran Corporation and then for OptumRx, Inc. and some of its affiliates ("OptumRx") after OptumRx acquired Catamaran. In that position, I provide supervision of OptumRx's pharmacy networks — the collection of pharmacies that have contracts with OptumRx and its affiliates — and I am familiar with OptumRx's network contracts, manuals, and guidelines for pharmacies that participate in the network.

2.       I submit this Declaration in opposition to Plaintiff Park Irmat Drug Corp.'s ("Irmat") motion for a preliminary injunction brought by Order to Show Cause to enjoin OptumRx from terminating it from OptumRx's retail pharmacy service network effective November 30, 2015.

### A.   OptumRx's Pharmacy Network

3.       OptumRx offers pharmacy benefit management ("PBM") services to insurers, third-party administrators, business coalitions, and employer sponsors of group health benefit plans. The array of services OptumRx and its affiliates offer their PBM clients includes the administration and maintenance of pharmacy networks.

4.       OptumRx provides only in-network PBM services and does not provide any out-of-

network pharmacy benefits.   In fact, OptumRx denies claims from pharmacies outside of the network at the point of service based on the lack of coverage for out-of-network pharmacy services.

5.      A pharmacy network consists of a group of pharmacies that have entered into contracts with a PBM under which they agree to provide pharmacy services to individuals who have enrolled in certain health benefit plans and comply with the terms and conditions of the network contract. In exchange, the PBM agrees to reimburse the pharmacies for the costs of the medications they dispense and provide payments for other services they provide.

6.      OptumRx administers two types of networks - "retail" and "mail-order" pharmacy networks. Pharmacies in the retail pharmacy network primarily dispense medication when they are face-to-face with their customers and are able to verify the customer's identity, provide them with instructions regarding how to administer and store the medication, and also answer any questions the customers might have.  In order to participate in the retail pharmacy network, pharmacies must meet certain basic requirements. For example, the pharmacies must be licensed by their state pharmacy boards, registered with the U.S. Drug Enforcement Administration, appoint a pharmacist-in-charge, and otherwise comply with federal and state laws related to the dispensing of medications.

7.      Dispensing medications by mail is more complex. The pharmacist is not face-to-face with the customer, so it is more difficult to verify the identity of the person who is receiving the medication. Many medications require refrigeration or other special handling, so they must be prepared, packaged, and shipped using special and unique precautions. To address these and other concerns, OptumRx has established an additional set of terms and conditions that pharmacies must meet in order to participate in OptumRx's mail pharmacy network. These terms and conditions include the requirement that pharmacies obtain accreditation by URAC, formerly known as Utilization Review Accreditation Commission (an independent accrediting agency),  as a mail service pharmacy, as well as accreditation from the National Association of Boards of Pharmacy as a

Verified Internet Pharmacy Practice Site. These accreditations provide OptumRx with assurance that pharmacies in its mail pharmacy network have the appropriate controls and processes in place to safely and effectively dispense medications by mail.

8.     Because the terms and conditions for participation in the mail pharmacy network are in addition to the terms and conditions for participation in the retail network, OptumRx permits pharmacies in its mail pharmacy network to also dispense medications when they are face-to-face with their customers. Thus, a pharmacy in the mail pharmacy network is effectively a participant in both the retail and mail pharmacy networks.

9.     OptumRx enforces the distinctions between its retail network and mail pharmacy networks by including a prohibition against dispensing medications by mail in its retail network contracts and Pharmacy Manuals. (*See* ¶13, *infra*.).

10.     In order to gain access to OptumRx's pharmacy networks, pharmacies such as Irmat sometimes enter into agreements with Pharmacy Services Administrative Organizations ("PSAOs"). PSAOs manage certain administrative functions for their member pharmacies, including network contracting. In this manner, PSAOs can serve as a single point of contact with a PBM on behalf of many independent pharmacies, making it easier for the pharmacies to enter into agreements with PBM networks. A PSAO may negotiate the terms and conditions of a network agreement with OptumRx on behalf of dozens of pharmacies.

11.     OptumRx has many competitors in the PBM industry. The service and contract terms it negotiates in its pharmacy network contracts are a key component of OptumRx's overall strategy to achieve a competitive advantage in the market.  For example, the circumstances under which either OptumRx or a network pharmacy may end their relationship has obvious and apparent competitive implications. Perhaps more importantly, these contracts help OptumRx to ensure the integrity and quality of its network, by allowing it the opportunity to end participation with non-

compliant pharmacies. If OptumRx is not permitted to negotiate, maintain and enforce these types of contract terms, its ability to compete in this market will be hampered and its ability to ensure the safety and quality of the PBM services it provides to its clients and their members will be severely restricted.

### B.   IRMAT'S PARTICIPATION IN OPTUMRX'S NETWORK

12.    Irmat has been a participant in OptumRx's retail pharmacy network through a PSAO known as AccessHealth. A true and correct copy of the Pharmacy Network Agreement entered into between OptumRx and Strategic Health Alliance d/b/a AccessHealth, the PSAO, effective February 10, 2015 (the "2015 Agreement") is annexed as Exhibit "3" to the Affidavit of Victor Falah dated November 12, 2015.[1] The 2015 Agreement provides that OptumRx has the authority to "terminate, suspend or revoke any Pharmacy location from participating under this Agreement immediately upon written notice to Company and Pharmacy if. . .(v) Pharmacy engages in mail fulfillment in violation of Section 3.10 without Administrator's written authorization." (Falah Aff., Ex. "3", pp. 14-15). Section 3.10 of the 2015 Agreement states, "No Mail Fulfillment or Solicitation. Company and Pharmacy shall not solicit a Member for mail delivery or deliver any Covered Prescription Services to a Member by mail, except upon the advance written approval of Administrator, which approval may be refused in the Administrator's sole discretion." (Falah Aff., Ex. "3", p. 9).

13.    OptumRx's 2012, 2013, 2014 and 2015 Pharmacy Manuals describe the credentialing requirements a pharmacy must meet in order to dispense via mail as an OptumRx pharmacy network provider.  Attached hereto as **Exhibits "A," "B,"** and **"C"** are the 2012, 2013 and 2014 OptumRx Pharmacy Manuals. A copy of the 2015 Pharmacy Manual that is currently available for download is annexed hereto as **Exhibit "D"**. (The Manual can also be downloaded at

---

[1] This Agreement contains highly competitively sensitive information regarding negotiated terms that the parties have agreed to and other proprietary business information, and thus, OptumRx joins in the request that the 2015 Agreement be sealed.

http://learn.optumrx.com/pharmacymanual/index.html <visited Nov. 16, 2015>). All of these Pharmacy Manuals advise the providers of the credentialing requirements to participate in OptumRx's mail pharmacy network. (*See* Exs. "A", p. 53; "B", p. 50.; "C", p. 57; and "D", p. 103).

14.     On December 1, 2014, OptumRx provided notice of its 2015 Pharmacy Manual, via email, to all of its contracted pharmacies, including Irmat through its agent AccessHealth. A copy of that notice from OptumRx is attached hereto as **Exhibit "E."** The 2015 Pharmacy Manual is currently in effect and incorporated by reference into the terms of the 2015 Agreement. (Falah Aff., Ex. "3", p.4, §1.32).

### B.     OPTUMRX NOTIFIES IRMAT OF ITS INTENTION TO TERMINATE BECAUSE OF ITS VIOLATION OF THE NO MAIL FULFILLMENT PROHIBITION

15.     Consistent with the 2015 Agreement, the OptumRx Pharmacy Manuals prohibit retail network pharmacies from delivering covered medications by mail, and defines "mail" as including shipping or delivering through the U.S. mail, any common carrier or any type of courier. This "No Mail Fulfillment" provision in the retail network agreements and Pharmacy Manual is included for public health reasons related to the previously mentioned difficulties in confirming patient identity in the mail fulfillment setting and the unique medication handling and storage requirements associated with mail fulfillment. There are more than 65,000 retail pharmacies in OptumRx's retail network. OptumRx relies on its network pharmacies to comply with their contracts and with the rules, policies, and procedures it has established and published. OptumRx does not actively monitor its retail pharmacy network to determine if pharmacies are dispensing via mail without meeting OptumRx's credentialing requirements for mailing.

16.     If OptumRx learns that a retail network pharmacy may be dispensing via mail, I have been advised by counsel that Irmat has argued that OptumRx should have known Irmat was dispensing drugs by mail because it had submitted 208,000 claims for OptumRx enrolless between

February 2013 through October 2015, many of which were for medications dispensed by mail. During that period, however, OptumRx processed approximately 1.3 billion prescriptions. While Irmat may believe that its volume of mail prescriptions was so large that it could not escape notice, the fact remains that all of its prescriptions dispensed during this period constitute less than two hundredths of one percent (0.016%) of the total volume of prescriptions that OptumRx processed during the period. Thus, in relative terms, the amount of Irmat's mail prescription claims was only a miniscule portion of the overall volume of prescription claims processed and would not have been sufficient on its own to alert OptumRx of Irmat's violation of the "No Mail Fulfilment" provision.

17.   Once OptumRx learns that a retail pharmacy network provider is improperly dispensing via mail, it conducts an investigation. Among other things, OptumRx reviews claims submitted by that pharmacy to compare the location of the pharmacy and the location of the covered patients ("members") whose prescription the pharmacy filled. If the pharmacy and member are located in different states, OptumRx can reasonably assume that the pharmacy is dispensing medication by mail and take appropriate action. This process is more complicated if the pharmacy is located in a large metropolitan area like New York City because many people from outside New York State work or travel to the city and may fill prescriptions there. If OptumRx concludes that it is likely the pharmacy is dispensing via mail, it sends that pharmacy a letter instructing it to stop doing so and warning that continued non-compliance will result in termination from the retail pharmacy network. Pharmacies that agree to stop dispensing via mail will remain in the retail pharmacy network.

18.   Earlier this year, OptumRx learned for the first time that Irmat appeared to be dispensing prescriptions via mail order to OptumRx members in violation of the "No Mail Fulfillment" provision of the 2015 Agreement. By letter dated August 31, 2015, OptumRx advised Irmat that mail fulfillment was a violation of the 2015 Agreement and instructed Irmat to confirm in

writing that it would stop dispensing by mail in violation of the 2015 Agreement or face immediate termination from the network. (*See* Falah Aff., Ex. 6). By letter dated September 18, 2015, Irmat confirmed that it was shipping medications to patients in other states but refused to stop. (*See* Falah Aff., Ex. 7). The record shows that OptumRx's decision to terminate Irmat is a direct result of its continued violation of the terms of the controlling agreements and its refusal to stop when asked to do so.

### C.      OTHER PHARMACIES IN OPTUMRX'S NETWORK

19.      Irmat alleges that it has developed a niche practice in the area of dermatological pharmaceutical supply.  However, most dermatological pharmaceuticals are widely available and are routinely dispensed in retail settings.  I reviewed OptumRx's business records for the period July 1, 2015 through October 31, 2015.  This data shows that approximately 25,000 different pharmacies in OptumRx's networks submitted claims for drugs manufactured by Galderma S.A. and Aqua Pharmaceuticals, which are the two pharmaceutical manufacturers with which Irmat claims to have a special relationship. These other retail pharmacies include well-known retail chains, including Rite Aid, Walgreens, Wal-Mart, and others.

20.      During the process of reviewing Irmat's response to OptumRx's August 31, 2015 letter to Irmat, Irmat's counsel identified a list of 43 medications that Irmat contends it routinely dispenses.  I reviewed OptumRx's business records for the period January 1, 2012 through October 31, 2015.  This data shows that OptumRx's mail pharmacies dispensed approximately 2,350 prescriptions for these drugs in 2012; 3,345 prescriptions for these drugs in 2013; 4,217 prescriptions for these drugs in 2014; and 3,518 prescriptions for these drugs in 2015.  If Irmat began dispensing via mail in 2013, Irmat's activity had no noticeable impact on OptumRx's mail dispensing.

21.      While Irmat also alleges that it has a unique arrangement with Galderma S.A. and

Aqua Pharmaceuticals to offer special discounts to its customers for these manufacturers medications, I am not aware of any such limited arrangement in this industry whereby a manufacturer restricts its cost-cutting programs to a particular pharmacy. Rather, the manufacturer makes its program available to all consumers regardless of where the prescriptions are filled.

22.     In fact, I reviewed a number of websites that reference discount or coupon programs offered by Galderma S.A. and Aqua Pharmaceuticals for their products. None of these coupons are pharmacy specific. The following are examples of discounts from these manufacturers that are currently available on the internet:

- http://www.epiduo.com/rebate_register.aspx
- http://differincoupon.com/
- http://rosacea-support.org/soolantra-savings-card-now-available.html
- https://www.pparx.org/prescription_assistance_programs/galderma_patient_assistance_program
- https://www.activatethecard.com/AccessSavings/welcome.html#

I declare under penalty of perjury that the foregoing is true and correct. Signed and dated this 24 th day of November, 2015 in Schaumburg, Illinois.

KERRI TANNER