UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

PARK IRMAT DRUG CORP.                           :
                                                :       Index No. 15-CV-08930
                                Plaintiff,       :
                                                :       (Rakoff, J.)
                      - vs. -                    :
                                                :
OPTUMRX, INC.                                    :
                                                :
                                Defendant.       :
-----------------------------------------------------------------x


**PLAINTIFF PARK IRMAT DRUG CORP.'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**



CONSTANTINE CANNON LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700

Matthew L. Cantor
David A. Scupp
Hamsa Mahendranathan

*Counsel for Plaintiff Park Irmat Drug Corp.*

# TABLE OF CONTENTS

**Page (s)**

PRELIMINARY STATEMENT .......................................................................................1

ARGUMENT.................................................................................................................3

    I.        Irmat will suffer irreparable harm absent a preliminary injunction. ........................3

    II.      Irmat will likely succeed on the merits of its claims. ..............................................5

        A.      Irmat will likely succeed on its contract and equitable estoppel claims. .....5

        B.      Irmat will likely succeed on its antitrust claims...........................................8

    III.    The balance of the hardships and public interest favor granting an injunction. ....10

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed. Group v. Rothenberg*,
   136 F.3d 897 (2d Cir. 1998) ................................................................. 5

*Ambroze v. Aetna Health Plans of N.Y., Inc.*,
   1996 WL 282069, at *6 (S.D.N.Y. May 28, 1996) ................................ 9

*BDRN, L.L.C. v. UnitedHealthcare of N.Y., Inc.*,
   No. 15-cv-0804 (NSR), 2015 U.S. Dist. LEXIS 55117 (S.D.N.Y. Mar. 18, 2015) ................ 4

*Blue Shield of Va. v. McCready*,
   457 U.S. 465, 478-79 (1982) ................................................................. 9

*Cnty of Nassau v. Leavitt*,
   524 F.3d 408, 414 (2d Cir. 2008) ......................................................... 5

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451, 481 (1992) ...................................................................... 10

*Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*,
   985 F. Supp. 2d 262, 271, 272 (D. Conn. 2013) ............................... 4, 10

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
   7 N.Y.3d 96, 104 (2006) ....................................................................... 7

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l*,
   241 F. Supp. 2d 246, 260-61 (S.D.N.Y. 2002) ................................... 6

*Hopkinton Drug, Inc. v. CaremarkPCS, L.L.C.*,
   77 F. Supp. 3d 237, 251 (D. Mass. 2015) .......................................... 2, 4

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   562 F. Supp. 2d 392, 404 (E.D.N.Y. 2008) ........................................ 10

*Movement Mortg., L.L.C. v. Ward*,
   2014 U.S. Dist. LEXIS 14531 (W.D.N.C. Feb. 5, 2014) ................... 4

*N. Shore Bottling Co. v. C. Schmidt & Sons*,
   22 N.Y.2d 171, 176 (1968) .................................................................. 5

*N. Tex. Preventive Imaging v. Eisenberg*,
   1996 U.S. Dist. LEXIS 19990, at *48 (C.D. Cal. Aug. 19, 1996) ........... 4

*N.Y. Medscan L.L.C. v. N.Y. Univ. Sch. of Med.*,
    430 F. Supp. 2d 140, 148-49 (S.D.N.Y. 2006) ........................................................ 9

*Rabin v. MONY Life Ins. Co.*,
    2010 WL 2838402 (2d Cir. July 21, 2010) ........................................................ 7

*Reuters, Ltd. v. United Press Int'l*,
    903 F.2d 904, 908 (2d Cir. 1990) ........................................................ 4

*Ring v. Arts Int'l*,
    7 Misc. 3d 869, 882 (N.Y. Civ. Ct. 2004) ........................................................ 8

*SizeWise Rentals, Inc. v. Mediq/PRN Life Support Servs.*,
    87 F. Supp. 2d 1194, 1200 (D. Kan. 2000) ........................................................ 4

*Tom Doherty Assocs. v. Saban Entm't, Inc.*,
    60 F.3d 27, 32 (2d Cir. 1995) ........................................................ 4

*Velez v. Prudential Health Care Plan*,
    943 F. Supp. 332, 343 (S.D.N.Y. 1996) ........................................................ 10

*Williams v. Citigroup, Inc.*,
    36 Misc. 3d 1201(a), at *4 (N.Y. Sup. Ct. 2012) ........................................................ 9

## Other

IIA Phililip E. Areeda, *Antitrust Law*, ¶ 348 (2014) ........................................................ 9

## PRELIMINARY STATEMENT

Irmat's motion for a preliminary injunction should be granted. Optum submits no evidence contravening Irmat's showing that it will incur irreparable harm absent an injunction staying its termination from Optum's network.[1] Specifically, Optum presents no facts disputing Irmat's evidence that such termination will cause Irmat's goodwill with dermatologists to substantially erode, forcing Irmat out of business due to significant losses of referrals. Optum similarly does not dispute that it is infected by a conflict-of-interest: it does not rebut that it is both a PBM with the power to distort pharmacy competition as well as the owner of a mail-order pharmacy, the profits of which go to Optum's bottom line. That conflict-of-interest is starkly evidenced by the November 23, 2015 letter from Optum's declarant, Kerri Tanner, sent to Irmat's customers in violation of the Court's Scheduling Order (ECF No. 22). That letter not only falsely notified those customers that Irmat was "*no longer participating in the OptumRx pharmacy network . . .as of 30-Nov-15*," but it advertised that these Irmat customers can "*transfer [their] prescription[s] to the OptumRx Mail Service Pharmacy.*" Falah Reply Decl. ¶¶ 2-3; Ex. 1 (emphasis added).

Now, Optum offers a pretext, never raised in the course of business, for its termination of Irmat: a general concern that mail-order pharmacies must (a) "verify the identity of the person who is receiving the medication" and (b) deliver medications that require "refrigeration or other special handling." Opt. Mem. 4. But Irmat takes measures to ensure medications are received by the patients for whom the medication is prescribed, and virtually none of the medications Irmat dispenses by mail require any "special handling." Falah Reply Dec. ¶¶ 8-9. Optum's revisionist

---

[1] Irmat seeks to enjoin its termination from any network operated by Optum or its affiliates, including Catamaran, a PBM that merged with Optum in July 2015. Irmat received Catamaran's notice of termination after commencing this action. Falah Reply Dec. ¶¶ 4-5; Exs. 2-3.

justification for Irmat's termination is meritless.

Optum's opposition lacks merit for other reasons too. *First*, Optum argues Irmat's loss of goodwill with referring dermatologists is "speculative, remote and . . . insufficient." Opt. Mem. 12. That is belied by Irmat data, recent sworn statements of health care professionals that they receive "one stop referrals," and the law. *See Hopkinton Drug, Inc. v. CaremarkPCS, L.L.C.*, 77 F. Supp. 3d 237 (D. Mass. 2015) (granting injunction to stay PBM termination of pharmacy).

*Second*, Optum argues that Irmat's contract and estoppel claims will fail because Irmat had or should have had notice of Optum's mail order prohibitions. This is just wrong. As summarized in the chart below, none of the claimed "notifications" that Optum references (Opt. Mem. 8-9) were provided to Irmat, and many of them did not prohibit mail order dispensation.

| Optum's Claimed Notification To Irmat | Actual Facts |
|---|---|
| "The 2012 OptumRx Pharmacy Manual, which stated that Irmat must be accredited by VIPPS and URAC to participate in mail order network." Opt. Mem. 8. | Irmat did not receive this Manual. Falah Reply Dec. ¶ 6. Optum provides no evidence to demonstrate that this was ever sent to Irmat. |
| "The 2012 Irmat/AccessHealth agreement, which required Irmat to give notice to AccessHealth if it changed delivery method '(e.g., retail to mail order).'" Opt. Mem. 8-9. | The agreement does not prohibit mail order. And, AccessHealth had notice of Irmat's mail order activities since, at least, May 2014. Falah Aff. (ECF No. 17) ¶ 45; Ex 12. |
| "The 2012 OptumRx/AccessHealth agreement, which prohibited Irmat from 'filling Prescriptions by mail . . .' for Medicare Part D patients." Opt. Mem. 9. | Irmat generally does not dispense prescriptions to Part D patients. Falah Aff ¶ 20. This does not apply to Irmat. Moreover, Irmat never was provided with this contract. *Id*. |
| "The 2013 OptumRx Pharmacy Manual, which stated that Irmat must be accredited by VIPPS and URAC to participate in the mail service network." Opt. Mem. 9. | Irmat did not receive this Manual. Falah Reply Dec. ¶ 6. Optum provides no evidence to the contrary. This requirement does not apply to pharmacies, like Irmat, that are "affiliated via PSAO." Tanner Dec. Ex B at 50. |
| "The 2014 OptumRx Pharmacy Manual, which stated that Irmat must be accredited by VIPPS and URAC to participate in the mail service network." Opt. Mem. 9. | Irmat did not receive this Manual. Falah Reply Dec. ¶ 6. Optum provides no evidence to the contrary. This requirement does not apply to pharmacies, like Irmat, that are "affiliated via PSAO." Tanner Dec. Ex C at 57. |
| "The 2015 OptumRx/AccessHealth agreement which prohibited Irmat from 'deliver[ing] | Irmat did not receive this agreement. Falah Aff. ¶ 24. Optum provides no evidence to the |

| | |
|---|---|
| Covered Prescription Services to a Member by any mail' and advised Irmat that it would be subject to immediate termination if it engaged in mail fulfillment." Opt. Mem. 9. | contrary. |
| "The 2015 OptumRx Pharmacy Manual, which stated that Irmat must be accredited by VIPPS and URAC to participate in the mail service network, prohibited Irmat from dispensing via mail, and advised Irmat that it would be subject to immediate termination if it engaged in mail fulfillment." Opt. Mem. 9. | Irmat never received this Manual. Falah Aff. ¶ 24. Optum claims it was emailed to Irmat by AccessHealth, but provides no evidence of that. Further, the notice provision of the Irmat/AccessHealth Agreement does not allow for email notification. Falah Aff. Ex. 1 § 16.3. |

Optum's claim that Irmat was notified of the "no mail order" and other material provisions of the Optum/AccessHealth Agreements is contrary to the facts. This lack of notice is particularly troubling, as Irmat was contractually entitled to receive notice of the terms of these Agreements. *See* Falah Aff. Ex. 1 §§ 2.1, 5.1, 5.3. It was not, as Optum contends, Irmat's responsibility to "obtain" them (*see* Opt. Mem. 3).

*Third*, Optum's antitrust arguments ring hollow under established precedent relevant to standing and market definition, and in light of Optum's (a) failure to identify or quantify unaffiliated pharmacies that participate in its "mail order network," and (b) admission that "Mail Order Pharmacies do not qualify for participation in . . . Retail Pharmacy networks."  Tanner Dec. Ex. D at 109. *Finally,* the balance of the equities favors an injunction. Optum's termination of Irmat will deprive patients of mail-order pharmacy services that offer low pricing and dermatological drug expertise, and will delay access to needed prescriptions.

## ARGUMENT

### I.    Irmat will suffer irreparable harm absent a preliminary injunction.

Collateral losses caused by termination, including goodwill that Irmat will lose from its long-standing customers and dermatologist referrers, constitute irreparable harm as a matter of law. These losses, evidenced by Irmat's discussions with dermatologists showing that referrals to

3

Irmat of non-Optum patients will decrease from this termination, are not quantifiable.[2] *See Tom*

*Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 32 (2d Cir. 1995) (affirming preliminary

injunction "[w]here the availability of a product . . . increases business of the plaintiff beyond

sales of that product*"*); *Reuters*, 903 F.2d at 908 (finding irreparable harm where some

customers "indicated not only a strong preference for the terminated product, but also have

threatened to stop dealing with the distributor if it cannot continue to supply that product").[3]

In *Hopkinton Drug,* a virtually identical case, a preliminary injunction was granted

staying a pharmacy's termination by a PBM where, as here, the PBM's members accounted for

"one quarter to one-third" of the pharmacy's "customer base." 77 F. Supp. 3d. at 251. The PBM

claimed, like Optum claims here, that the plaintiff could be compensated in monetary damages.

The court disagreed, holding "[t]he fact that that loss may largely be quantified does not entirely

satisfy the damage to [plaintiff]'s goodwill because there are collateral benefits to any drugstore

from its customer base." *Id.* Here, the collateral impact on Irmat's business resulting from the

loss of its sales via Optum's termination will cause unquantifiable, irreparable harm.[4] *See also*

*Fairfield Cnty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 272 (D.

---

[2]     Prescribers will stop recommending Irmat altogether to their patients if Irmat cannot
service members of Optum, one of the largest PBMs. *See* Falah Aff. ¶¶34-35; O'Keefe Aff.
(ECF No. 16) ¶¶ 9-16. Notably, evidence that "present customers will cease" doing business
with Irmat need not even be provided in order to prove irreparable harm. *Reuters Ltd. v. United
Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (holding that there is a "catch 22 implication
of requiring" a plaintiff to provide such evidence). Optum does not contest "one-stop referral"
practices exist.

[3]     Contrary to Optum's argument, injury caused by loss of referrals cannot be quantified
and constitutes irreparable harm. *See SizeWise Rentals, Inc. v. Mediq/PRN Life Support Srvs.,
Inc.*, 87 F. Supp. 2d 1194, 1200 (D. Kan. 2000) (harm to plaintiff's interests in goodwill and
referral sources is irreparable and cannot be measured in monetary terms); *Movement Mortg.,
LLC v. Ward*, 2014 U.S. Dist. LEXIS 14531 (W.D.N.C. Feb. 5, 2014); *N. Tex. Preventive
Imaging v. Eisenberg*, 1996 U.S. Dist. LEXIS 19990, at *48 (C.D. Cal. Aug. 19, 1996).

[4]     Irmat seeks an injunction to maintain the status quo, unlike the plaintiff in *BDRN, LLC v.
UnitedHealthcare of N.Y., Inc.*, 2015 U.S. Dist. LEXIS 55117 (S.D.N.Y. Mar. 18, 2015), which
sought a mandatory injunction. *Id.* at *8. That case, cited by Optum, is thus inapposite.

4

Conn. 2013) (granting PI due to reputational harm to physicians from health plan termination).

**II.    Irmat will likely succeed on the merits of its claims.**

To prevail here, Irmat need only show that there are "sufficiently serious questions going to the merits" of its claims. *Cnty. of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008). Irmat has, nonetheless, demonstrated that it will likely succeed on the merits. *See* MOL at 10-19.[5]

**A.    Irmat will likely succeed on its contract and equitable estoppel claims.**

Irmat and Optum are parties to a contract implied-in-fact under which Irmat provided mail-order pharmacy services to Optum members.[6] *See* MOL at 10-12. Its terms are evidenced by the parties' conduct, including Optum's reimbursement of over 208,000 prescriptions that Irmat delivered by mail. *See* O'Keefe Aff. ¶ 7. Optum, however, asserts Irmat is bound by the terms of the 2015 Agreement between Optum and AccessHealth, which, unlike prior agreements, made it a *terminable offense* for a "retail" pharmacy to provide mail-order services.[7] When AccessHealth and Optum entered into that contract, they knew such a prohibition would destroy Irmat. *See* O'Keefe Aff. ¶¶ 3-16; Falah Aff. ¶¶ 33-35; Falah Aff. Ex. 12. Optum's claim that Irmat agreed to this onerous deal via an agency with AccessHealth is meritless.

Irmat's agreement with AccessHealth did not give AccessHealth *carte blanche* to bind Irmat to agreements as AccessHealth saw fit.  Rather, the Irmat/AccessHealth agreement

---

[5]    Irmat's opening memorandum of law (ECF No. 15) is cited herein as "MOL."

[6]    Optum's assertion that the parties' implied-in-fact contract is barred by the statute of frauds is meritless.  New York's statute of frauds only applies to agreements which are, by express stipulation, not to be performed within a year. *N. Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 176 (1968). That is not the case here, where there is nothing that mandates Irmat and Optum maintain their contractual relationship longer than one-year. *American Federal Group, Ltd. v. Rothenberg*, 136 F.3d 897 (2d Cir. 1998), cited by Optum, is inapposite because it concerned the enforceability of an implied non-compete covenant that was 13 months in duration. *Id.* at 909.

[7]    Optum does not dispute that pharmacies could distribute via mail (except to Medicare Part D patients) under its pre-2015 agreement with AccessHealth. *See* Falah Aff. Ex. 2.

provided an opportunity for Irmat to ratify its participation in payor agreements. *See* Falah Aff. Ex. 1 § 2.1 (AccessHealth to furnish a "written summary of the terms and conditions of each Payor Agreement" that AccessHealth "***propose[d]***" to Irmat) (emphasis added).[8] However, the evidence shows that Irmat was not even provided notice of the existence of the 2015 Optum/AccessHealth Agreement until August 2015. Falah Aff. ¶ 24. These facts show that AccessHealth had no authority to bind Irmat to its 2015 Agreement with Optum.[9]

Nor do Optum's Pharmacy Manuals bind Irmat to any mail-order dispensation prohibition. The first iteration of the Manual to contain such a prohibition was the 2015 edition – a document that Irmat was not informed about until August 2015.[10] Optum claims it notified AccessHealth via email in December 2014 that the 2015 Manual was available online (Tanner Dec. ¶ 14; Ex. E); however, Optum provides no evidence that such notice was ever *transmitted to Irmat*. Regardless, email does not constitute effective notice under the Irmat/AccessHealth agreement, as Optum concedes.  *See* Falah Aff. Ex. 1 § 16.3; Opt. Mem. 8.

Relying on its pre-2015 Manuals, Optum also wrongly contends that "the parties' agreements . . . informed Irmat that it needed VIPPS and URAC certifications in order to engage in mail order fulfillment." Opt. Mem. 17. The explicit terms of the 2013 and 2014 Manuals (never received by Irmat) require URAC and VIPPS accreditation *only* "[i]f you," unlike Irmat, "are a Pharmacy that is not affiliated via PSAO."  *See* Tanner Dec. Ex. B at 50; Ex. C at 57.

---

[8]     Irmat was entitled receive notice of the "no mail order" provisions under several clauses in the Irmat/AccessHealth Agreement. *See* Falah Aff. Ex. 1 §§ 2.1, 5.1, 5.3.

[9]     *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246 (S.D.N.Y. 2002), relied on by Optum, notes that an agent can only bind a principal within the scope of the agent's authority. *Id.* at 260.  It also notes that an agent only has an apparent authority to bind a principal when such authority derives from a reasonable interpretation of the principal's conduct. *Id.* at  261. At the very least, Irmat's substantial mail-order dispensation shows Irmat did not give AccessHealth apparent authority to bind Irmat to Optum's 2015 "no mail order" terms.

[10]     *Compare* Tanner Dec. Exs. A-C *with* D; Falah Aff. ¶ 24.

6

Irmat, of course, has been affiliated with the PSAO AccessHealth since July 30, 2012. Thus, prior to 2015, no URAC or VIPPS accreditation was required.[11]

In any event, Optum waived any right that it could have had to terminate Irmat for dispensing by mail by knowingly reimbursing Irmat for tens of thousands of mail-order deliveries since early 2013. *See* MOL at 13. Optum downplays the significance of these reimbursements by asserting it processed approximately 1.3 billion prescriptions in this time period. Tanner Dec. ¶ 16. But that fails to account for the substantial resources that Optum has to monitor the dispensation activities of network pharmacies, including "a workforce of 65,000."[12] Further, Optum does not deny that its contractual partner, AccessHealth, was aware by May 2014 that 80% of Irmat's prescriptions were delivered by mail order. Falah Aff. ¶ 45; Ex. 12. Optum's conduct amounts to a "clear manifestation of intent to relinquish" any "right" to terminate Irmat for mail-order dispensation. *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006).[13]

Finally, regardless of whether Irmat and Optum were parties to an implied or express contract, Optum breached the implied covenant of good faith and fair dealing. *See* MOL 13-14. Optum wrongly asserts that "[t]here cannot be a breach of this implied covenant where the party purportedly in breach (here, Optum) has actually complied with the express terms of the parties' agreements." Opt. Mem. 20.[14] To the contrary, "[a] breach of the covenant of good faith and fair

---

[11]     Irmat expects this accreditation in as soon as 4 months. Kennedy Reply Dec. ¶ 6.
[12]https://www.optumrx.com/RxSolWeb/mvc/cmsContent.do?pageUrl=/CHP/AboutUs/Company Information.
[13]     Optum's reliance on the no-waiver provision of its 2015 agreement with AccessHealth (*see* Opt. Mem. 19) is unavailing. Irmat did not consent to, and was never provided notice of, this provision, and cannot be bound by it. Optum's citation to the no-waiver provision in the Irmat/AccessHealth Agreement is likewise misplaced, as Optum is not a party to that agreement.
[14]     *Rabin v. MONY Life Ins. Co.*, 2010 WL 2838402 (2d Cir. July 21, 2010), relied upon by Optum for this contention, does not involve the implied covenant of good faith and fair dealing.

dealing may include conduct . . . that does not violate an express term of [a contract], but constitutes arbitrary, irrational, or manipulative action in exercising discretion otherwise permitted . . ." *Ring v. Arts Int'l, Inc.*, 7 Misc. 3d 869, 882 (N.Y. Civ. Ct. 2004) (citing cases). Optum violated this implied covenant in numerous ways (*see* MOL at 14), including by unilaterally[15] enacting in 2015 a prohibition on "retail" pharmacies providing mail-order services – a drastic shift meant to destroy pharmacies with substantial mail-order business, like Irmat.[16]

### B.    Irmat will likely succeed on its antitrust claims.

Irmat will likely succeed on its antitrust claims. In the least, serious questions are raised by Optum's structure, which permits it to use its control over 65 million patients to force "retail" pharmacies to accede to its "no mail order" terms.[17] Optum's November 23, 2015 correspondence (Falah Reply Dec. Ex. 1) forcefully shows how Optum intends to use its PBM might to reduce mail order pharmacy competition and steer Irmat customers to its own pharmacy. Optum's arguments to the contrary all fail.[18]

---

[15]    Optum's 2015 Pharmacy Manual was disseminated two months before the February 2015 Optum/AccessHealth Agreement.  That prohibition was thus not negotiated.

[16]    To the extent the Court finds no enforceable contract between Optum and Irmat, Irmat is likely to succeed on its equitable estoppel claim. *See* MOL 14-16. Optum's contention that Irmat concealed material facts from Optum (Opt. Mem. 21) is wrong. Irmat was openly providing mail-order services for years to Optum members, and submitting claims to Optum, which Optum knowingly reimbursed. *See* MOL at 4-5, 13. AccessHealth, for one, was aware of Irmat's substantial mail-order business since at least May 2014. *See* Falah Aff. ¶ 45; Ex. 12.

[17]    *See* comments of Rep. Douglas Collins, United States House Judiciary Subcommittee on Regulatory Reform, Commercial and Antitrust Law, *Hearing: the State of Competition in the Pharmacy and PBM Marketplaces*, 11/17/15, available at http://www.judiciary.house.gov/index.cfm/hearings?ID=2B5EF134-2F2E-49D4-8308-9B965C80187E (noting concerns of anticompetitive conduct resulting from OptumRx's prohibiting pharmacy competitors from dispensing by mail).

[18]    Responding to Irmat's tortious interference claim, Optum admits that it competes with Irmat, stating that it "dispenses," but only to a "very little" extent, the medicines dispensed by Irmat. Opt. Mem at 22. Importantly, Optum fails to state whether it also dispenses other drugs that compete with the Irmat-dispensed medicines. Optum's November 23 correspondence demonstrates that it obviously competes with Irmat. *See* Falah Dec. Ex. 1.

8

*First,* Optum argues that Irmat does not have antitrust standing, as, according to Optum, Irmat has not "pled injury to competition in any relevant market." Opt. Mem. 23. This is wrong. Irmat has standing as a competitor in the relevant market for mail-order pharmacy services to Optum members. *See Blue Shield of Va. v. McCready,* 457 U.S. 465, 478-79 (1982) (finding that "competitors" have antitrust standing); IIA Phillip E. Areeda, *Antitrust Law,* ¶ 348 (2014) ("a rival clearly has standing to challenge the conduct of [a] rival[]").[19]

Moreover, contrary to Optum's suggestion, Irmat's case does not concern only a single competitor but *all* pharmacies in Optum's "retail" pharmacy network. Compl. (ECF No. 24-1) ¶¶ 90-94. Optum's 2015 Manual identifies the broad application of its mail order prohibition, stating that "Mail Order Pharmacies ***do not qualify*** for participation in [Optum's] Retail Pharmacy Networks as a Retail Pharmacy." Tanner Decl. Ex. D at 109 (emphasis added).[20]

Further, the Complaint alleges that this restraint has foreclosed competition to Optum's members: it states that "as far as Irmat is aware, there are no other significant mail-order pharmacies in Optum's network." Compl. ¶ 67; *see also* Falah Reply Dec. ¶¶ 11-13; Ex. 1. In this regard, Optum neither quantifies nor identifies any pharmacies in its mail-order network in its opposition. And the evidence here shows that the restraints have caused harm to competition – that patients would have enjoyed lower pricing, had greater access to quality dermatological drug dispensation services, and not had their quality of care disrupted if not for these restraints.[21]

---

[19]     Optum's cited cases are unavailing: they do not concern the exclusion of one competitor by another. *See Williams v. Citigroup, Inc.,* 36 Misc.3d 1201(a) at *4 (N.Y. Sup. Ct. 2012); *Ambroze v. Aetna Health Plans of N.Y., Inc.,* 1996 WL 282069, at *6 (S.D.N.Y. May 28, 1996).

[20]     This statement also entirely undermines Optum's position that no tying arrangement exists because "a pharmacy in the mail order pharmacy network is effectively a participant in the both the retail and mail pharmacy networks." Tanner Dec. at ¶ 8; Opt. Mem. 22.

[21]     *See N.Y. Medscan v. NYU Sch. of Med.,* 430 F. Supp. 2d 140, 148-49 (S.D.N.Y. 2006) (Chin, J.) (holding alleged reduction in quality of radiology services due to network exclusion of single provider constitutes injuries that "the antitrust laws were designed to prevent.").

9

*Second,* Optum argues that Irmat has failed to allege a cognizable relevant market.  That too is wrong. Single brand markets, like the market at issue for mail-order services to Optum members, have been recognized by the Supreme Court where consumers, such as Optum members, have no ability to choose a viable substitute. *See, e.g.*, *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Kodak . . . contends that . . .a single brand of a product or service can never be a relevant market under the Sherman Act. *We disagree*.") (emphasis added).[22] Here, Optum's members are "locked in," as most patients "obtain their insurance coverage based on the whims of their employer," and it is health plans, that choose the PBM.  Compl. ¶ 60.  Optum does not dispute this.

## III.   The balance of the hardships and public interest favor granting an injunction.

While Irmat will suffer irreparable harm without an injunction, Optum will suffer none.[23] Optum merely claims it generally seeks to ensure proper dispensation of prescriptions requiring refrigeration or special handling.[24] The balance of hardships test warrants an injunction.

Furthermore, an injunction will prevent harm to the public, as thousands of patients will have to wait for needed drugs if Irmat is forced to transfer their prescriptions to other pharmacies. Falah Aff. ¶¶ 36-43. These patients will also lose their long-standing relationships with a pharmacy that knows their medical history. *Id*. ¶ 44.[25]

---

[22]     *See also In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.,* 562 F. Supp. 2d 392, 404 (E.D.N.Y. 2008) (finding that "single brand" market for "Network services for MasterCard Credit Cards" can exist, as merchants are locked into accepting them, and despite that merchants also contract for Visa and American Express network services).

[23]     *See Velez v. Prudential Health Care Plan*, 943 F. Supp. 332, 343 (S.D.N.Y. 1996) (granting injunction where insurance company could "point[] to no specific harm that it would suffer beyond the cost of . . . treatment.").

[24]     Irmat would agree to refrain from its dispensation of such medications via mail, pending URAC/VIPPs accreditation, but Optum never requested Irmat do so. Falah Reply Dec. ¶ 10.

[25]     *See Fairfield*, 985 F. Supp. 2d at 271 (terminating doctors from health plans "may . . . offend the public interest.").

Dated: New York, New York          **CONSTANTINE CANNON LLP**
        December 1, 2015

By: _____/s/ Matthew L. Cantor_____
     Matthew L. Cantor
     David A. Scupp
     Hamsa Mahendranathan
335 Madison Avenue
New York, New York 10017
(212) 350-2700

*Counsel for Park Irmat Drug Corp.*

11