UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
PARK IRMAT DRUG CORP.,                    :
                                          :
                                          :    15 Civ. 8930 (JSR)
        Plaintiff,                        :
                                          :         OPINION
        -v-                               :
                                          :
OPTUMRX, INC.,                            :
                                          :
        Defendant.                        :
----------------------------------------x



JED S. RAKOFF, U.S.D.J.

By "bottom-line" order dated December 15, 2015, this Court denied plaintiff's motion for a temporary restraining order and preliminary injunction enjoining defendant from terminating plaintiff from defendant's retail pharmacy network during the pendency of this litigation. This Opinion explains the reasons for that ruling.

Plaintiff Park Irmat Drug Corp. ("Irmat") is a pharmacy located in midtown Manhattan. Defendant OptumRx, Inc. ("Optum") is one of the largest Pharmacy Benefit Managers ("PBMs") in the United States, providing coverage for prescription drugs to over 65 million members. By way of general background on the workings of the industry, PBMs such as Optum are third-party administrators of prescription drug programs, responsible for managing the pharmacy benefits for health plans, negotiating drug discounts with drug manufacturers, developing lists of approved drugs for reimbursement, and processing pharmacies' and patients' prescription drug claims.

1

In this capacity, PBMs build networks of pharmacies through which their members can purchase prescription medications at "covered" (*i.e.*, discounted) rates. In order to gain access to a PBM's pharmacy network, pharmacies often contract with third-party Pharmacy Services Administrative Organizations ("PSAOs") that serve as a single point of contact for the PBMs and negotiate and contract with PBMs on the pharmacies' behalf.

Optum administers two types of pharmacy networks, a "retail" pharmacy network (which consists of some 65,000 pharmacies) and a "mail-order" pharmacy network. To participate in Optum's mail-order network, pharmacies must meet a specialized set of requirements, including being accredited by the Utilization Review Accreditation Commission as a mail service pharmacy, as well as by the National Association of Boards of Pharmacy as a Verified Internet Pharmacy Practice Site. Optum contends that it requires these accreditations to ensure that mail-order pharmacies have the appropriate controls and processes in place to safely dispense medication to patients by mail. Optum also owns and operates its own mail-order pharmacy.

Irmat has been a member of Optum's pharmacy network since at least 2006. Complaint ("Compl") ¶ 4, ECF No. 7. In July 2012, however, Irmat entered into an agreement with the PSAO AccessHealth (the "Irmat/AccessHealth Agreement") in order to gain continued access to over 100 third-party payor networks, including Optum's, from which Irmat's customers receive prescription drug coverage. At that time, AccessHealth had a pharmacy network agreement in place

with Optum (the "Prescription Drug Services Agreement") to which
Irmat became subject. The parties appear to agree that the
Prescription Drug Services Agreement did not prohibit the provision
of mail-order pharmacy services except with respect to Medicare Part
D patients -- to whom Irmat did not provide such services "as a
general matter." *Id.* ¶ 39.

Beginning in 2011, Irmat began developing a niche practice in
dermatology and, over the next several years, expanded this practice
by participating in programs sponsored by certain dermatological
drug manufacturers, under which such manufacturers would cover some
or all of customers' co-pays. *See* Affidavit of Victor Falah dated
Nov. 12, 2015 ("Falah Aff.") ¶¶ 15-16, ECF No. 17. As a result,
Irmat's business grew substantially and, in 2013, it began filling
prescriptions via mail order. Irmat's revenue from Optum members has
increased from approximately $2 million in 2012 to a projected $33
million in 2015. *See* Affidavit of Christopher O'Keefe dated Nov. 12,
2015 ("O'Keefe Aff.") ¶ 7, ECF No. 18. At the time of the filing of
its motion, mail orders represented 80% of Irmat's business, *see*
Falah Aff. ¶ 16, and sales to Optum members accounted for 27% of
Irmat's sales overall, *see* O'Keefe Aff. ¶ 5.

In February 2015, AccessHealth and Optum entered into a new
pharmacy network agreement (the "2015 Agreement"), with AccessHealth
purporting to act on behalf of its participating pharmacies in its
capacity as their agent. *See* Falah Aff., Ex. 3. Section 3.10 of the
2015 Agreement prohibits such pharmacies from engaging in mail-order

3

fulfillment except upon advance written approval of Optum, and §
5.2.4 of the 2015 Agreement authorizes Optum to "terminate, suspend
or revoke any Pharmacy location from participating under this
Agreement immediately upon written notice to Company and Pharmacy if
. . . (v) Pharmacy engages in mail fulfillment in violation of
Section 3.10 without Administrator's written authorization."

     In apparent contravention of its separate agreement with Irmat,
AccessHealth never furnished Irmat a written summary of the terms
and conditions of the 2015 Agreement. *See* Falah Aff. ¶¶ 19-20. As a
result, Irmat contends, it had no knowledge of the terms of the
Agreement until it was advised by Optum by letter dated August 10,
2015 that Irmat was filling mail-order prescriptions in violation of
the 2015 Agreement. *See* Falah Aff., Ex. 4; Falah Aff. ¶ 24. Optum
requested that Irmat confirm within ten business days that it would
cease the prohibited activity. In response, by letter dated August
17, 2015, Irmat requested "a 90-day delay in any action by Optum"
and argued that it and its patients "would be irreparably harmed if
termination occurs." *Id.*, Ex. 5. On September 16, 2015, Optum
advised Irmat via email that while Irmat must "remain in compliance
with the retail agreement, including the no mail prohibition,"
nonetheless, if it wished to avoid termination, it could apply to
Optum's mail-order pharmacy network. *Id.*, Ex. 6. Irmat, in turn,
requested that Optum allow it to continue dispensing medication by
mail while it applied for the necessary accreditations to join
Optum's mail-order pharmacy network. *Id.*, Ex. 7. By letter dated

September 28, 2015, Optum advised Irmat that it would be terminating Irmat for cause, effective November 30, 2015. *Id.*, Ex. 8.

On November 12, 2015, Irmat filed a complaint against Optum in New York State Supreme Court for breach of contract, equitable estoppel, tortious interference with business relations, and antitrust violations under New York's Donnelly Act. *See* Declaration of Michael H. Bernstein dated Nov. 24, 2015 at ¶ 3, ECF No. 24. On November 13, 2015, Irmat filed the instant motion. *Id.* ¶¶ 4-5. That same day, Optum filed a notice of removal on diversity grounds pursuant to 28 U.S.C. § 1446 and the action was assigned to this Court. Ultimately, on consent of the parties, the Court issued a scheduling order setting a briefing schedule on plaintiff's motion and staying the termination of Irmat from Optum's pharmacy network until a hearing was held. Order dated Nov. 23, 2015, ECF No. 22.

A court may issue a preliminary injunction and temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (internal quotation mark omitted). A party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary

5

relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks omitted). In addition, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). A preliminary injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and whether to grant such relief "rests in the sound discretion of the district court," *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Johnson v. Newport Lorillard*, 2003 WL 169797, at *1 (S.D.N.Y. Jan. 23, 2003).[1]

"To establish irreparable harm, the movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (internal quotation marks omitted); *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the

---

[1] "The standard for granting a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of Procedure are identical." *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002).

parties cannot be returned to the positions they previously
occupied").

Irmat makes a facially compelling case that Optum's termination
of it from its pharmacy network represents an existential threat to
its business. Irmat contends that losing the ability to service
Optum members (who account for 27% of Irmat's sales overall) will
have spill-over effects on the rest of its business. According to
Irmat, most dermatologists -- not wanting to bother with determining
which pharmacies can fill which prescriptions for which patients --
do not make referrals to particular pharmacies based on a patient's
coverage, but rather refer their patients to one or two pharmacies
that accept all major insurance providers. *See* O'Keefe Aff. ¶ 11.
Thus, Irmat submits that most dermatologists will simply stop
referring patients to Irmat altogether if Irmat is terminated from
Optum's network. These losses, Irmat contends, are not quantifiable
and will not be easily recaptured even if Irmat ultimately prevails
in this litigation, since referring dermatologists will have moved
on to other pharmacies.[2]

---

[2] In support of this proposition, Irmat points to its recent
experience with customers from the state of Georgia. Because of a
new Georgia state licensing requirement, Irmat briefly ceased
providing mail-order services to customers in Georgia in June 2015.
*See* O'Keefe Aff. ¶¶ 14-15. As a result, dermatologists in Georgia
found alternative pharmacies to refer patients to. *Id.* ¶ 16. Though
Irmat resumed the provision of such services in August 2015, "the
vast majority of dermatologists that had previously referred
patients to Irmat did not revert back to doing so." Plaintiff's
Opening Brief ("Pl. Br.") at 10, ECF No. 15.

Optum responds that any losses Irmat might suffer are quantifiable, pointing to the fact that Irmat, in its papers, calculates the amount of revenues it derives from Optum members and the percentage of prescriptions from its top physician referrers that were made out for Optum members. But being able to break down actual revenues and referrals is a much simpler task than assessing the extent to which termination from Optum will affect Irmat's non-Optum business. And Optum does not attempt to rebut Irmat's assertion that termination from Optum's network will result in dermatologists opting not to refer to Irmat altogether. As such, given the significant difficulties inherent in attempting to quantify the impact that termination from Optum's network will have on Irmat's business, the Court finds that Irmat has met its burden of showing an actual and imminent injury for which it lacks an adequate remedy at law. *See Salinger*, 607 F.3d at 81 ("Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure . . . .").

Turning to the merits, however, the Court finds that plaintiff has failed to show a likelihood of success on the merits on any of its claims. Plaintiff's first cause of auction is for breach of contract. Rather than argue that Optum has breached any of the written contracts between the parties discussed above, Irmat argues that the parties entered into an implied-in-fact contract, as evidenced through their conduct, by which Irmat would provide pharmacy services to Optum's members and, in return, Optum would

reimburse Irmat for the drugs that it dispenses to those members. Under this supposed implied-in-fact contract, Irmat was not prohibited from providing mail-order pharmacy services to Optum members and never agreed that doing so would constitute grounds for termination. "A contract cannot be implied in fact where there is an express contract covering the subject matter involved." *Julien J. Studley, Inc. v. New York News, Inc.*, 70 N.Y.2d 628, 629 (1987). Thus, as part and parcel of its breach-of-contract argument, Irmat argues that it is not bound by the terms of the 2015 Agreement between Optum and its agent AccessHealth -- which made it a terminable offense for a "retail" pharmacy to provide mail-order services to Optum members -- because it had no notice of it and did not ratify it.

Irmat's argument that it is not bound by the 2015 Agreement ultimately fails. But before progressing any further in the analysis of the 2015 Agreement, the Court must address an oddity with respect to that agreement that emerged after briefing and oral argument on the instant motion. In the 2015 Agreement, AccessHealth "warrants that it has the authority to enter into th[e] Agreement as the agent for and on behalf of each Pharmacy identified on Exhibit A" and that "that each Pharmacy identified on Exhibit A has agreed to be bound by and comply with all of the terms and conditions of this Agreement." Falah Aff., Ex. 3, § 3. Exhibit A, however, by defendant's own admission, was not attached to the contract and perhaps never existed. *See* Declaration of Jake McCreary dated Dec.

15, 2015 ("McCreary Decl.") ¶ 3. According to McCreary, a supervisor of pharmacy network operations at Optum who assists in the administration of the 2015 Agreement, "it has been the practice of the parties throughout their relationship to rely on data sent to OptumRx by AccessHealth to identify the pharmacies enrolled in the AccessHealth PSAO and participating in the OptumRx pharmacy network pursuant to the Contract." *Id.* AccessHealth has identified Irmat as such a pharmacy throughout the relevant period. *Id.* ¶¶ 4-9.

The Court finds that the missing exhibit does not render the 2015 Agreement fatally indefinite for three independent and alternative reasons. *First*, while AccessHealth purports in § 3 of the Agreement to act on behalf of the pharmacies listed on Exhibit A, its description of whom it represents is not so limited elsewhere in the Agreement. Indeed, the 2015 Agreement "is made and entered into by and between [Optum] . . . and [AccessHealth] *as attorney-in-fact on behalf of its Participating Pharmacies*." Falah Aff., Ex. 3, at 1 (emphasis added). AccessHealth similarly represented in the Recitals section of the Agreement that it "has the authority to enter into this Agreement as the agent for and on behalf of its Participating Pharmacies." *Id.*, Recital D. "Pharmacy" and "Pharmacies," in turn, are defined to mean "each or all the eligible pharmacy or pharmacies, pharmacy chains and/or pharmacy locations participating in [Optum's] network in accordance with the Agreement,

addenda, exhibits, subsequent amendments, etc. and as specified on Exhibit A." *Id.* ¶ 1.30.[3]

At first glance, it is unclear whether "and as specified on Exhibit A" is intended to characterize the pharmacies described in the preceding language or is, rather, intended to represent one of several sets of pharmacies that constitute a "Pharmacy" (and, in turn, a "Participating Pharmacy") under the 2015 Agreement. But to adopt the former interpretation (such that "Pharmacies" refers only to those pharmacies specified on Exhibit A) would read the language "participating in [Optum's] network in accordance with the Agreement, addenda, exhibits, subsequent amendments, etc." out of the definition. To give those words effect, a pharmacy not listed on Exhibit A must at least be capable of qualifying as a Pharmacy under the Agreement; otherwise, the definition could have referred simply to "eligible pharmacy or pharmacies, pharmacy chains and/or pharmacy locations, as specified on Exhibit A," and left it at that. *See Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (under New York law, "[a]ny interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible" (internal quotation marks omitted)).

Notably, on the signature page of the 2015 Agreement, immediately above the signature of the signatory for AccessHealth,

---

[3] "Participating Pharmacies" is not a defined term in the 2015 Agreement.

the "Chain Codes" 605 and 630 are listed. Plainly then, Chain Code
605, of which Irmat is a member, *see* McCreary Decl. ¶ 4, is an
"eligible . . . pharmacy chain[] . . . participating in [Optum]'s
network in accordance with the Agreement." As such, regardless of
the absence of Exhibit A, AccessHealth entered into the 2015
Agreement in its capacity as Irmat's agent (among many other
pharmacies). Such an interpretation is particularly warranted in
light of the well-settled principle that a "contract must
be interpreted so as to give effect to, not nullify, its general or
primary purpose." *Smith v. City of Buffalo*, 120 A.D.3d 1588, 1589
(N.Y. App. Div. 4th Dep't. 2014) (internal quotation mark omitted).

     *Second*, and alternatively, even if the 2015 Agreement could be
read to have intended to bind only those Pharmacies identified on
Exhibit A, the absence of Exhibit A would not in and of itself
render the Agreement invalid. Rather, "[b]efore rejecting an
agreement as indefinite, a court must be satisfied that the
agreement cannot be rendered reasonably certain by reference to an
extrinsic standard that makes its meaning clear. The conclusion that
a party's promise should be ignored as meaningless is at best a last
resort." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74
N.Y.2d 475, 483, (1989) (citation and internal quotation marks
omitted); *see also 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd.
Corp.*, 78 N.Y.2d 88, 91 (1991) ("[W]here it is clear from the
language of an agreement that the parties intended to be bound and
there exists an objective method for supplying a missing term, the

court should endeavor to hold the parties to their bargain.");

*Matter of Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 547-48 (1995)

("[C]ourts may as a matter of interpretation carry out the intention

of a contract by transposing, rejecting, or supplying words to make

the meaning of the contract more clear . . . in those limited

instances where some absurdity has been identified or the contract

would otherwise be unenforceable either in whole or in part.").

While these principles are generally applied to supply, for example,

a missing price term or, in the case of the *Wallace* doctrine, to

correct an absurd scrivener's error, the principles are equally

applicable to the situation at bar where the contracting parties

failed to attach an important exhibit. Here, the reference to Chain

Codes 605 and 630 on the signature page of the 2015 Agreement

supplies the "extrinsic standard" or "objective method" by which the

Court can hold the parties to the bargain they struck. In other

words, rather than toss the 2015 Agreement as meaningless -- "a last

resort" -- the Court may properly under New York law interpret the

references to "Exhibit A" in the Agreement to refer to those

pharmacies (such as Irmat) in Chain Codes 605 and 630.

Third, and finally, even if the 2015 Agreement were interpreted

to bind no Pharmacies at the time of execution because of the

missing exhibit, the 2015 Agreement explicitly contemplates that

pharmacies will be added to the Optum network *subsequent to* the

execution of the 2015 Agreement. *See* Falah Aff., Ex. 3, § 3.4.3

("[AccessHealth] shall provide [Optum] with at least fifteen (15)

days written notice prior to adding a new Pharmacy Location for use

in providing Covered Prescription Services to Members, which new

Pharmacy location shall satisfy and comply with all terms and

conditions of this Agreement . . . . On a monthly basis

[AccessHealth] will provide a complete list of Pharmacies as of the

end of the month as well as a summary list of new and former

Pharmacies processed during the previous calendar month."). The fact

that that mechanism is in place, and that Optum treated Irmat as an

active pharmacy under the 2015 Agreement by virtue of the

information provided to it by AccessHealth, *see* McCreary Decl. ¶¶ 5-

9, further undermines any argument that Irmat cannot be bound by the

2015 Agreement simply because Exhibit A was not attached to the

Agreement.

　　　　Returning to the arguments made in the briefing, Irmat's

argument that it is not bound by the 2015 Agreement because it had

no notice of it and did not ratify it is unpersuasive. Under black-

letter agency law, a principal need not have notice to be bound by

his agent. "It is well-settled that the principal is bound by notice

to or knowledge of his agent in all matters within the scope of his

agency although in fact the information may never actually have been

communicated to the principal." *Farr v. Newman*, 14 N.Y.2d 183, 187

(1964); *Minskoff v. Am. Express Travel Related Servs. Co.*, 98 F.3d

703, 708 (2d Cir. 1996) ("Under general principles of agency, the

authority of an agent 'is the power of the agent to do an act or to

conduct a transaction on account of the principal which, with

14

respect to the principal, he is privileged to do because of the principal's manifestations to him.'"). Here, Irmat's agreement with AccessHealth provides that "[AccessHealth] shall have the authority to negotiate and enter into prospective Payor Agreements for the provision of Covered Pharmacy Services to Covered Persons. [Irmat] agrees that [AccessHealth] has the sole and exclusive right to bind [Irmat] to [Payor Plans], provided that [Irmat] may . . . opt out of Payor Plans as described in Section 5.2." Falah Aff., Ex. 1, § 5.1. Section 5.2 of the Agreement, in turn, contemplates that Irmat may "opt out of Payor Agreements available within the network selected by [Irmat]," although it will initially be "automatically enrolled in all Payor Agreements available under [said] network." *Id.* § 5.2. As such, Irmat, by the plain language of its own contract with AccessHealth, agreed to be bound to agreements entered into by AccessHealth on Irmat's behalf unless it opted out of such agreements, regardless of whether Irmat would have agreed to those terms in the first instance. *See Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 260 (S.D.N.Y. 2002) ("It is black letter law that an agent binds his principal when he enters into a contract within the scope of his authority."); *E. River Sav. Bank v. Samuels*, 284 N.Y. 470, 480 (1940) ("When an agent contracts in the name of his principal, the principal contracts and is bound . . . .").

Though it would appear that Irmat's authorization of AccessHealth to bind it could not be clearer, Irmat argues that

AccessHealth did not have "*carte blanche* to bind Irmat to agreements
as AccessHealth saw fit," Plaintiff's Reply Brief ("Pl. Reply Br.")
at 5 (ECF No. 29), seizing on a provision of the Irmat/AccessHealth
Agreement that requires AccessHealth to "furnish [Irmat] a written
summary of the terms and conditions of each Payor Agreement for
which [AccessHealth] *proposes* that [Irmat] participate." Falah Aff.,
Ex. 1, § 2.1 (emphasis added). But the word "proposes" cannot bear
the weight plaintiff assigns to it in light of § 5 of the Agreement.
An obligation to furnish a summary of terms is not tantamount to a
requirement that Irmat ratify those terms for an agreement to be
effective. The absence of any ratification procedure in the
Irmat/AccessHealth Agreement defeats such an interpretation, for if
the parties intended such a limitation on AccessHealth's ability to
bind Irmat, they almost certainly would have provided for one
explicitly. And given that the Agreement allows for Irmat to opt out
of Payor Agreements that it does not wish to participate in, the use
of the word "proposes" in § 2.1 is not remotely inconsistent with
the framework established by § 5.[4] That AccessHealth allegedly failed
to furnish Irmat with a written summary of the terms and conditions
of the 2015 Agreement, in apparent contravention of § 2.1 of their
agreement, may very well provide Irmat with a viable breach-of-

---

[4] Because the Court finds that AccessHealth had actual authority to
bind Irmat, it need not reach the issue of whether, in the absence
of such actual authority, Irmat would still be bound by the 2015
Agreement on a theory of apparent authority.

contract claim against AccessHealth. But it does not provide Irmat with a breach-of-contract claim against Optum.[5]

Irmat also argues that Optum waived any contractual right to terminate Irmat for providing mail-order pharmacy services, in light of the fact that Optum reimbursed Irmat for over 200,000 prescriptions throughout the country from February 2013 through October 2015, without objection until August 2015. *See* O'Keefe Aff. ¶ 7. Noting that claims submitted by Irmat reflect less than two hundredths of one percent of the claims processed by Optum during that period, Optum responds that it did not know that Irmat was filling mail orders in violation of the 2015 Agreement until it conducted an investigation in mid-2015. But the Court need not wade into this factual dispute because the 2015 Agreement explicitly provides that "[t]he failure of any party to insist in any one or more instances upon performance of any terms or conditions of this Agreement shall not be construed as a waiver . . . and the obligations of such party with respect thereto shall continue in full force and effect." Falah Aff., Ex. 3, § 11.3. Such "[n]o-waiver clauses are valid and enforceable" under New York law, and therefore

---

[5] Irmat argues that Optum's 2015 Pharmacy Manual (which describes the necessary accreditations for mail-order pharmacies), and Optum's prohibition on providing mail-order pharmacy services, were not clearly incorporated by reference into Irmat's own separate agreement with AccessHealth. This argument is a red herring that the Court need not reach. The dispositive point, for purposes of plaintiff's breach-of-contract claim, is that the *2015 Agreement* entered into on Irmat's behalf by AccessHealth is a valid contract that binds Irmat.

Irmat's waiver argument fails. *Am. Movie Classics Co. v. Time Warner Entm't, L.P.*, 2005 WL 3487852, at *12 (N.Y. Sup. Ct. 2005). Irmat argues that the 2015 Agreement's no-waiver provision is inapplicable for the same reasons it argues that it is not bound by the 2015 Agreement generally, but that argument fails for the same reasons stated above.

Finally, Irmat claims that Optum acted in violation of the implied covenant of good faith and fair dealing by (1) prohibiting the provision of mail-order pharmacy services without notifying Irmat directly or seeking its consent; (2) demanding that Irmat cease providing mail-order services within 10 days or face termination; and (3) deciding to terminate Irmat despite Irmat's willingness to apply to Optum's mail-order pharmacy network. While "even an explicitly discretionary contract right may not be exercised in bad faith so as to frustrate the other party's right to the benefit under the agreement," *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288, 302 (N.Y. App. Div. 1st Dep't. 2003), "[t]o sustain a breach of the implied covenant claim, the claimant must allege and show that the other party exercised a [contractual] right malevolently, for its own gain as a part of a purposeful scheme designed to deprive [claimant] of the benefits under the contract," *Wilmington Trust Co. v. Strauss*, 2006 WL 3076611, at *8 (N.Y. Sup. Ct. 2006) (internal quotation marks omitted).

Irmat has failed to show that it is likely to be able to demonstrate that Optum acted with the requisite bad faith to support such a theory of breach. Again, plaintiff's effort to pin its agent's failure to notify it of the 2015 Agreement on Optum is not well-taken. As for Optum's decision to terminate Irmat from its network, it was Irmat's choice to continue breaching the 2015 Agreement upon being notified of its breach rather than to cease filling mail-order prescriptions from Optum members while its application to Optum's mail-order pharmacy network remained pending. While Optum perhaps has not acted with the greatest generosity toward Irmat under the circumstances, it cannot be the case that Optum's decision to act on its contractual right to terminate Optum in the face of Irmat's continued breach constitutes bad faith. Although Irmat suggests that Optum pursued such termination in an effort to squash competition, these allegations are conclusory and are further undermined by the undisputed fact that Optum invited Irmat to apply to its mail-order pharmacy network as part of the parties' correspondence. *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007) ("[C]onclusory allegations of a party's failure to act in good faith alone are insufficient . . . .").[6]

---

[6] Plaintiff's implied covenant theory faces another hurdle that renders its success unlikely, *viz.*, "New York law requires dismissal of an implied covenant claim where the claim derives from the same set of facts as a breach of contract claim," as it does here. *FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 231 (S.D.N.Y. 2009).

At bottom, Irmat is seeking to replace the written agreement between the parties with an unwritten, implied-in-fact contract with terms more favorable to Irmat. That it cannot do. As such, plaintiff has failed to show a likelihood of success on its breach-of-contract claim.

With its second cause of action, Irmat argues that Optum is precluded by the doctrine of equitable estoppel from terminating Irmat from its network. Here, too, Irmat fails to show a likelihood of success on the merits. "Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts. The parties asserting estoppel must show with respect to themselves: (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *In re Vebeliunas*, 332 F.3d 85, 93-94 (2d Cir. 2003) (citation omitted). The "doctrine is to be invoked sparingly and only under exceptional circumstances." *LoCiciro v. Metro. Transp. Auth.*, 288 A.D.2d 353, 355 (N.Y. App. Div. 2d Dep't 2001) (internal quotation marks omitted).

Irmat argues that it is likely to succeed on this claim because it relied to its detriment on Optum's reimbursement of its mail-order sales to Optum members from 2013 to 2015, substantially expanding its business from 20 to 208 employees and spending

20

millions of dollars to expand its operations. Optum argues that equitable estoppel is unavailable because Irmat has a contractual relationship with Optum that governs the parties' relationship. *See Kopelowitz & Co. v. Mann*, 2009 WL 1037734, at *11 (N.Y. Sup. Ct. 2009) ("Claims for equitable estoppel that are duplicative of dismissed breach of contract claims are properly dismissed."). Irmat appears to concede the point on reply, assuming that the Court finds an enforceable contract between Optum and Irmat. *See* Pl. Reply Br. at 8 n.16. But, in any case, Irmat has failed to demonstrate that it is likely to be able to show (1) that Optum concealed anything from Irmat; (2) that Optum intended Irmat to act on any such concealment or misrepresentation, or (3) that Irmat lacked "the means of knowledge of the true facts." To the contrary, Irmat knew it was in Optum's pharmacy network and knew that it was obligated under the Irmat/AccessHealth agreement to "comply with the policies and procedures" of Optum. Falah Aff., Ex. 1, Recitals; *id.* ¶ 8.1. Irmat does not even plead that it lacked the means to know the true facts -- an understandable omission given that its own agent executed the agreement at issue.

Nor has Irmat met its burden of showing a likelihood of success on its third cause of action for tortious interference with business relations. "To prevail on a claim for tortious interference with business relations in New York, a party must prove (1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3)

that the defendant acted solely out of malice or used improper or
illegal means that amounted to a crime or independent tort; and (4)
that the defendant's interference caused injury to the relationship
with the third party." *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71
A.D.3d 40, 47 (N.Y. App. Div. 1st Dep't 2009). Irmat argues that
Optum's termination of Irmat from its pharmacy network will
interfere with its business relationships with customers,
dermatologists, and drug manufacturers. It further contends,
summarily, that "Optum's termination of Irmat is not in its member's
[sic] interests . . . or in pursuit of legitimate business
objectives" and that the purpose of the termination is "to
el[i]minate a competitor in violation of antitrust law." Plaintiff's
Opening Brief ("Pl. Br.") at 16, ECF No. 15. Optum responds that it
simply has chosen to terminate Irmat from its network because Irmat
refused to stop breaching the governing network agreement. While a
violation of New York's Donnelly Act (assuming *arguendo* that one has
occurred) would constitute a crime under New York law, the New York
Court of Appeals has emphasized that "conduct constituting tortious
interference with business relations is, by definition, conduct
directed not at the plaintiff itself, but at the party with which
the plaintiff has or seeks to have a relationship." *Carvel Corp. v.
Noonan*, 3 N.Y.3d 182, 192 (2004). Irmat has not pled nor argued that
Optum's conduct is directed at parties other than Irmat itself, so
its claim is defective in this regard. *See Valley Lane Indus. Co. v.
Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 106–

07 (2d Cir. 2012) (affirming dismissal of tortious interference with
business relations claim because defendant's allegedly wrongful
conduct "was directed at [plaintiff], rather than [the third
party]," such that plaintiff's "allegations could not satisfy the
wrongful means element even if they did sufficiently allege tortious
conduct"). And Irmat's allegation that Optum acted "with the sole
purpose of harming Irmat" is conclusory. Compl. ¶ 86. In any case,
in order to show a likelihood of success on the merits of its
tortious interference claim, plaintiff would need to show a
likelihood of success on the merits of its antitrust claims, which,
as explained below, plaintiff has failed to do.

Turning to those claims, the Donnelly Act tracks the federal
Sherman Act, prohibiting "[e]very contract, agreement, arrangement
or combination whereby [a] monopoly . . . is or may be established
or maintained, or whereby [c]ompetition or the free exercise of any
activity in the conduct of any business, trade or commerce or in the
furnishing of any service . . . is or may be restrained." N.Y. Gen.
Bus. Law § 340(1); see also Anheuser-Busch, Inc. v. Abrams, 71
N.Y.2d 327, 335 (1988) (the Donnelly Act "should generally be
construed in light of Federal precedent"). Irmat argues that the
2015 Agreement violates the Donnelly Act in two ways: (1) by
"negatively" tying retail pharmacy services to mail-order pharmacy
services; and (2) as an unreasonable restraint on trade.

The elements of an illegal per se tying claim are: "(1) that
the tying arrangement affects a substantial amount of interstate

commerce; (2) the two products are distinct; (3) the defendant actually tied the sale of the two products; and (4) the seller has appreciable market power in the tying market." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 n.5 (2d Cir. 2001), *overruled on other grounds*, *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006). As an initial matter, though Optum does not brief the viability of a "negative tying" theory in general, such a theory is far from well-established. A few courts have recognized that "[i]n addition to outlawing 'positive' ties likely to restrain competition, Section 1 [of the Sherman Act] also forbids 'negative' ties -- arrangements conditioning the sale of one product on an agreement *not* to purchase a second product from competing suppliers." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1178 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). But plaintiff fails to cite a case in the Second Circuit or a decision of a New York state court that has accepted or applied the theory. *See Posa, Inc. v. Miller Brewing Co.*, 642 F. Supp. 1198, 1209 (E.D.N.Y. 1986) (noting that plaintiffs had failed to "cite[] any case authority for the proposition that such a negative tie is unlawful"). And Irmat cites no case in which a practice like defendant's has been found to constitute tying. Indeed, at a minimum, "tying" is an awkward fit on these facts since Optum is not offering products in the traditional sense of the word, or preventing Irmat from purchasing the "tied" product from a competitor. Rather, on plaintiff's theory, Optum is

unlawfully forcing Irmat to choose between Optum's own pharmacy networks.

The Court need not resolve the viability of plaintiff's negative tying theory on this motion, because even assuming the theory would be viable on the facts pled, the theory is based on a mistaken factual premise. According to Optum, Irmat's contention that "Optum has forced its pharmacies that participate in Optum's 'retail' pharmacy network to refrain from providing mail order pharmacy services" is factually incorrect. Defendant's Brief ("Def. Br.") at 22 (quoting Pl. Br. at 17), ECF No. 25. To the contrary, Optum explains:

> A pharmacy that meets the credentialing requirements of both the retail and mail networks is welcome to participate in both. It does not have to choose one or the other. If the pharmacy meets the credentialing requirements of the retail network, it may dispense in the retail setting. If it meets the additional requirements of the mail network, it can dispense in both retail and mail settings.

*Id.; see also* Declaration of Kerri Tanner dated Nov. 24, 2015 ("Tanner Decl.") ¶ 8 ("Optum[] permits pharmacies in its mail pharmacy network to also dispense medications when they are face-to-face with their customers. Thus, a pharmacy in the mail pharmacy network is effectively a participant in both the retail and mail pharmacy networks."), ECF No. 23.

In response, Irmat points to the 2015 Pharmacy Manual, which provides that "Mail Order Pharmacies do not qualify for participation in the Administrator Retail Pharmacy networks as a

Retail Pharmacy." Tanner Decl., Ex. D at 109. While it is difficult
(albeit not impossible[7]) to reconcile that provision with Optum's
representations to the Court, Optum's position in this litigation is
unequivocal: "There is no prohibition against a properly
credentialed pharmacy participating in both the mail-order and
retail pharmacy networks." Def. Br. at 10 n.6. Even if it were the
case that a pharmacy could not *technically* belong to both networks,
Optum's substantive point that a pharmacy in its mail-order network
is not prevented from dispensing medication face-to-face in a retail
capacity remains unrebutted. Irmat fails to identify any action that
a pharmacy in Optum's retail pharmacy network can take that a
pharmacy in Optum's mail-order pharmacy network cannot. Put
differently, Irmat appears unlikely to be able to show that Optum is
negatively tying membership in the retail network to membership in
the mail-order network because a properly credentialed pharmacy can
dispense medication both by mail and in a retail capacity (*i.e.*, in-
store). This is borne out by the fact that Irmat is desperately
trying to gain admission to Optum's mail-order network and has not
indicated anywhere in its papers that it believes that obtaining
such admission will have any negative effect whatsoever on its
retail operations. Because the Court finds that plaintiff has failed

---

[7] The relevant provision in the 2015 Pharmacy Manual could be
reasonably read to mean that a mail-order pharmacy does not qualify
for participation in Optum's retail pharmacy network merely by
virtue of being a mail-order pharmacy, rather than as completely
foreclosing the possibility of a pharmacy participating in both
networks.

to show a likelihood of success on the merits on its tying claim on this ground, the Court need not reach defendant's arguments as to antitrust standing and market definition.

Irmat's claim that Optum and AccessHealth have restrained competition in violation of the Donnelly Act by entering into the 2015 Agreement appears similarly weak. Under the Sherman Act (which the parties look to), to make out such a claim "plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *Geneva Pharms. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 506 (2d Cir. 2004). Irmat argues that the 2015 Agreement unreasonably restrains trade in the market for mail-order pharmacy services to Optum members by allowing Optum to terminate retail pharmacies for providing mail-order pharmacy services. Given that the 2015 Agreement was entered into *on behalf of* Irmat by its agent AccessHealth, Irmat is placing itself in the position of arguing that an agreement to which it is a party unreasonably restrains trade, *i.e.*, Irmat is essentially accusing itself of violating the Donnelly Act. While the parties fail to brief this issue, the Court is skeptical that Irmat will be able to prevail on such a claim given this posture. Nor has plaintiff demonstrated that it is likely to be able to show that the Agreement *unreasonably* restrains trade or "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market," rather than merely an adverse effect on plaintiff's balance

sheet. *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993).[8]

Irmat has thus failed to show a likelihood of success on the merits on any of its claims. However, under this Circuit's case law, if the balance of hardships tipped decidedly in plaintiff's favor, injunctive relief would be warranted if plaintiff could make the lesser showing of "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35. Though the Court indicated in its December 15 bottom-line order that the balance of hardships tips in plaintiff's favor, on reflection it finds that the balance of hardships do not tip *decidedly* in plaintiff's favor. With respect to this factor, Irmat argues that while it "will suffer irreparable harm without an injunction, Optum will suffer none." Pl. Reply Br. at 10. However, the "balance of hardships" requirement would be superfluous if it could be met simply by virtue of making the already-required showing of irreparable harm. *See Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979) ("A 'balance of hardships tipping decidedly toward the party requesting the preliminary relief' must mean real hardship from the denial of relief Pendente lite not merely the showing of

---

[8] Irmat asserts in a footnote, without any explanation, that the 2015 Agreement constitutes a *per se* illegal "group boycott," but Irmat fails to explain who is boycotting what. Pl. Br. at 19 n.7. The word "boycott" does not even appears in its complaint. This argument is made far too summarily to warrant the Court's consideration.

difficulty of measurement which may suffice to constitute
'irreparable damage' where a plaintiff shows probable success."").
While plaintiff faces a significant hardship in the form of
potentially irreparable harm to its business upon termination, the
requested injunction would impose some hardship on Optum insofar as
it would force Optum to bear risks related to Irmat acting as a
mail-order pharmacy without the accreditations required by Optum for
the purported purpose of patient safety. Tanner Decl. ¶ 7;
Transcript of Proceedings held on Dec. 11, 2015 at 15 ("Optum
doesn't have any reassurance that Irmat is qualified and is not
going to do something that could potentially be a danger to patient
care that Optum may ultimately be responsible for not doing proper
credentialing."), ECF No. 37.[9]

Perhaps more significantly, to a large extent the hardship
Irmat faces is one of its own making. Though Irmat was purportedly
unaware of the 2015 Agreement prior to being notified by Optum that
it was in breach of it, Irmat continued to breach the 2015 Agreement
months after being advised that it would face termination if it did
not cure its breach. Significantly, Optum did not simply advise
Irmat that it was terminating it. Rather, Optum gave Irmat the
opportunity to cure its breach and, on September 16, 2015, advised
Irmat that it could apply to Optum's mail-order pharmacy network if
it wanted to continue filling mail orders from Optum members. At

_____

[9] While Irmat dismisses these justifications as pretextual, this
contention, at present, lacks evidentiary support.

that time, Irmat had a choice: (1) it could continue breaching the
2015 Agreement (to the extent it was bound by that agreement) while
it obtained the required credentials and hope that Optum would
change its mind in the course of negotiations or that it would
succeed in obtaining injunctive relief in litigation; or (2) it
could cease filling mail-order prescriptions from Optum members
while its application to Optum's mail-order pharmacy network
remained pending (thereby obviating the need for this litigation),
but otherwise continue to be a member of Optum's retail pharmacy
network. While that choice may not have been an attractive one for
Irmat -- indeed, the second option surely would have been disruptive
to Irmat's mail-order business (though presumably not as disruptive
as full-scale termination) -- it was a choice nonetheless. Irmat
chose to continue breaching, and, under the circumstances, the Court
does not see how the balance of hardships could be said to tip
*decidedly* in plaintiff's favor. *Columbus Rose Ltd. v. New Millennium
Press*, 2002 WL 1033560, at *10 (S.D.N.Y. May 20, 2002) (where party
had "deliberately sailed in harm's way" and "the hardship of which
it complains [was] significantly of its own making," hardship
argument was not credited); *Warner Bros. Entm't v. Glob. Asylum,
Inc.*, 2012 WL 6951315, at *22 (C.D. Cal. Dec. 10, 2012) (where
"hardship" was one of defendant's "own making," such hardship
"carrie[d] little weight with the Court" in the balance of hardships
analysis). Even if the balance of hardships did tip decidedly in
plaintiff's favor, however, the Court would still find that

plaintiff had not raised sufficiently serious questions going to the merits to warrant injunctive relief.[10]

In sum, for the foregoing reasons, the Court, in its December 15, 2015 Order, denied plaintiff's motion for a temporary restraining order and preliminary injunction.

Dated:    New York, NY
          January 12, 2016

_____
JED S. RAKOFF, U.S.D.J.

---

[10] A court assessing a motion for a preliminary injunction must "ensure that the 'public interest would not be disserved' by the issuance" of such an injunction. *Salinger*, 607 F.3d at 80. Here, plaintiff has failed to show that an injunction is warranted and, as such, the Court need not address the public interest. However, to the extent the issue has not been entirely obviated, the Court finds the public interest to be a neutral factor. On the one hand, termination will result in the disruption of medical services to many of Irmat's customers. On the other hand, at present, Irmat lacks the accreditations as a mail-order pharmacy that Optum contends it requires to ensure that "pharmacies in its mail pharmacy network have the appropriate controls and processes in place to safely and effectively dispense medications by mail." Tanner Decl. ¶ 7. The public has an interest in uninterrupted *and* safe medical care and, as such, the public interest would not clearly be served or disserved by the issuance of the requested injunction.