UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
PARK IRMAT DRUG CORP.                            :
                                                 :    Index No. 15-CV-08930
                            Plaintiff,           :
                                                 :    (Rakoff, J.)
         - vs. -                                 :
                                                 :
OPTUMRX, INC.                                    :
                                                 :
                            Defendant.           :
------------------------------------------------------------------x

**PLAINTIFF PARK IRMAT DRUG CORP.'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR RECONSIDERATION**

CONSTANTINE CANNON LLP
335 Madison Avenue
New York, New York 10017
(212) 350-2700

Matthew L. Cantor
David A. Scupp
Hamsa Mahendranathan

*Counsel for Plaintiff Park Irmat Drug Corp.*

**TABLE OF CONTENTS**

**Page (s)**

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT FACTS .......................................................................................................................2

ARGUMENT...................................................................................................................................4

    I.    Relevant Standards..................................................................................................4

    II.    The Court overlooked controlling Second Circuit law in holding that the balance of hardships did not tip "decidedly" toward Irmat....................................................................................5

    III.    The Court erred by holding that the lack of an "Exhibit A" did not create sufficiently serious questions going to the merits of Irmat's breach of contract claim. ............................................7

CONCLUSION..............................................................................................................................11

## TABLE OF AUTHORITIES

**Cases**

*Aim Int'l Trading, L.L.C. v. Valcucine S.p.A.*,
  2002 U.S. Dist. LEXIS 10373, at *19-20 (S.D.N.Y. June 11, 2002) ......................................... 6

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*,
  601 F.2d 48, 58 (2d Cir. 1979) ................................................................................................ 6

*Cnty. Of Nassau v. Leavitt*,
  524 F.3d 408, 414 (2d Cir. 2008) ............................................................................................ 4

*Flame Cut Steel Prods. Co., Inc. v. Performance Foams Coatings, Inc.*,
  46 F. Supp. 2d 222, 228 (E.D.N.Y. 1999) ............................................................................ 11

*Mikol v. Barnhart*,
  554 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2008) ....................................................................... 4

*Minskoff v. Am. Express Travel Servs.*,
  98 F.3d 703, 708 (2d Cir. 1996) ............................................................................................ 11

*Olin Corp. v. Am. Home Assurance Co.*,
  704 F.3d 89, 99 (2d Cir. 2012) ................................................................................................ 9

*Plaza Health Labs., Inc. v. Perales*,
  878 F.2d 577, 580 (2d Cir. 1989) ............................................................................................ 4

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*,
  749 F.2d 124 (2d Cir. 1984) .................................................................................................... 5

*Scarsdale Cent. Serv. v. Cumberland Farms, Inc.*,
  2014 U.S. Dist. LEXIS 86552, at *4-5 (S.D.N.Y. June 24, 2014) ........................................... 4

*Schoolcraft v. City of New York*,
  298 F.R.D. 134, 136 (S.D.N.Y. 2014) .................................................................................... 4

*Semmes Motors, Inc. v. Ford Motor Co.*,
  429 F.2d 1197 (2d Cir. 1970) .................................................................................................. 5

**Statutes**

Local Civil Rule 6.3 ........................................................................................................................ 1

Fed. R. Civ. P. 59(e) ....................................................................................................................... 1

Plaintiff Park Irmat Drug Corp. ("Irmat") respectfully moves the Court, pursuant to Local Civil Rule 6.3 and Rule 59(e) of the Federal Rules of Civil Procedure, for an order granting Irmat's Motion for a Preliminary Injunction (ECF No. 8, Irmat's "Motion"), in reconsideration of the Court's Order of December 16, 2015 (ECF No. 34) (the "December 16 Order"), as modified by the Court's January 12, 2016 Opinion (ECF No. 43) (the "January 12 Opinion").

## PRELIMINARY STATEMENT

Reconsideration of the December 16 Order and January 12 Opinion is warranted because the Court overlooked controlling Second Circuit law regarding the balance-of-hardships test and made erroneous findings regarding "Exhibit A." As a result, the Court wrongfully concluded that Irmat failed to meet what the Second Circuit labels the "less rigorous" preliminary injunction standard whereby a movant, after demonstrating irreparable harm, must merely show that (1) the balance of hardships tips decidedly in the movant's favor and (2) sufficiently serious questions going to the merits to make them a fair ground for litigation.

*First*, the Court overlooked controlling Second Circuit precedent by concluding that the balance of hardships did not tip "decidedly" in Irmat's favor. *See* January 12 Opinion at 28. That precedent particularly holds that the balance of hardships tips "decidedly" in the movant's favor if the movant may be driven out of business absent an injunction and the opposing party will suffer little harm should an injunction ensue. That is precisely the case here. The Court found that Optum's termination was an "existential threat" to Irmat's business, and that Optum had not even attempted to rebut Irmat's showing that, should termination be effectuated, physicians would no longer refer prescriptions to Irmat. Optum, on the other hand, has failed to show that it would incur any significant harm should the Court grant Irmat's Motion.

*Second*, the Court erred when it found that the undisputed lack of an "Exhibit A" to the

1

2015 Pharmacy Network Agreement between Optum and Irmat's PSAO AccessHealth (the "2015 Agreement") did not raise sufficiently serious questions going to the merits of Irmat's claims to make them a fair ground for litigation. "Exhibit A," critically, is referenced by the 2015 Agreement as the list of pharmacies that have agreed to be bound to the 2015 Agreement through AccessHealth, their agent. *See* § 3 of the 2015 Agreement ("[AccessHealth] further represents and warrants that each Pharmacy identified on Exhibit A has agreed to be bound by and comply with all of the terms and conditions of this Agreement."). Indeed, the 2015 Agreement references Exhibit A *no less than ten times*. But, of course, Exhibit A does not exist. There is thus no document that unambiguously identifies which pharmacies were bound by AccessHealth to that Agreement, much less any document that specifically states that Irmat agreed to be bound to that Agreement. Given AccessHealth's knowledge of Irmat's substantial mail-order business and the undisputed fact Irmat would never have authorized AccessHealth to enter into an agreement with Optum that would destroy its mail-order business, which was responsible for 80% of Irmat's sales, the lack of any "Exhibit A" raises, in the very least, serious questions as to whether AccessHealth bound Irmat to the 2015 Agreement at all.

      As Irmat has demonstrated that the balance of hardships tips decidedly in Irmat's favor, and the existence of serious questions going to the merits of Irmat's claims, Irmat has met the "less rigorous" preliminary injunction standard. Irmat respectfully submits that the Court should reconsider its denial of Irmat's Motion.

## RELEVANT FACTS

      This case concerns Optum's termination of Irmat from Optum's pharmacy networks. Irmat is a pharmacy that provides mail-order pharmacy services that compete with those provided by Optum's own mail-order pharmacy.

Optum claims to have terminated Irmat because Irmat violated Optum's rules prohibiting "retail" pharmacies in Optum's network from providing mail-order pharmacy services to Optum members. These rules, which were adopted and implemented without Irmat's consent, have destroyed and will destroy the very competition that Irmat and numerous other pharmacies offer in mail-order pharmacy services.

On November 13, 2015, Irmat moved this Court for a preliminary injunction barring Optum from terminating Irmat from Optum's pharmacy networks for the duration of this lawsuit. *See* ECF No. 8. For a detailed recitation of the facts relevant to Irmat's Motion, Irmat respectfully refers the Court to Irmat's memoranda of law and supporting papers. *See* ECF Nos. 15, 16, 17, 18, 19, 27 (with exhibits), 28, and 29.

After oral argument on December 11, 2015 and receiving, in response to the Court's directive, an affidavit from Optum on December 15 which explained that Exhibit A to the 2015 Agreement did not exist, the Court issued the December 16 Order denying Irmat's Motion, and noted that "a memorandum will issue in due course giving the reasons for this decision." December 16 Order at 1. On December 16, on a joint telephone conference with the parties, the Court denied Irmat's request for leave to file a motion for reconsideration, stating that since the Court had not yet issued its opinion, any such motion at that juncture would not have been in good faith. On January 12, the Court issued an Opinion elucidating and modifying its rationale for denying the requested preliminary injunction. Whereas, in the December 16 Order, the Court held that Irmat had shown that the "balance of the hardships tips in [Irmat's] favor," in the January 12 Opinion, the Court held that, "on reflection," that balance did not tip "decidedly" in Irmat's favor. On January 16, 2016, on a joint telephone conference with the parties, the Court granted Irmat leave to file the instant motion for reconsideration of the December 16 Order and

3

January 12 Opinion.

## ARGUMENT

**I.     Relevant Standards.**

"Whether to grant or deny a motion for reconsideration or reargument is in the sound discretion of a district court judge."  *Mikol v. Barnhart*, 554 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2008) (quotation marks omitted).  A court may grant reconsideration where the party moving for reconsideration "can point to controlling decisions or data that the court overlooked," *Scarsdale Cent. Serv. v. Cumberland Farms, Inc.*, 2014 U.S. Dist. LEXIS 86552, at *4-5 (S.D.N.Y. June 24, 2014), or if the movant "demonstrates an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Schoolcraft v. City of New York*, 298 F.R.D. 134, 136 (S.D.N.Y. 2014) (internal quotation marks omitted).

In the Second Circuit, a party seeking a preliminary injunction must show: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."  *Cnty. Of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008).  The "fair-ground-for-litigation standard" is "less rigorous" than the test for showing a likelihood of success on the merits.  *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989).

As explained below, in denying Irmat's motion for a preliminary injunction, the Court overlooked controlling law and new evidence in holding that Irmat failed to meet the "less rigorous" fair-ground-for-litigation standard.

## II. The Court overlooked controlling Second Circuit law in holding that the balance of hardships did not tip "decidedly" toward Irmat

The January 12 Order overlooked controlling Second Circuit law regarding the balance of hardships in preliminary injunction cases where the movant may go out of business due to the opposing party's termination of a contract. In such cases, the balance of hardships tips "decidedly" in a movant's favor if a preliminary injunction will not cause significant harm to the opposing party.

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124 (2d Cir. 1984) is instructive. In *Roso-Lino*, the Second Circuit granted plaintiff's motion for a preliminary injunction. Plaintiff, a small Coca-Cola distributor, sought to preliminarily enjoin defendant Coca-Cola's termination of plaintiff's distributorship agreement. *Id.* at 125. After finding that the termination would result in the loss of plaintiff's business, the Second Circuit noted that it was "clear" that the equities tip "decidedly in favor of" the plaintiff. *Id.* at 126. The Court held that it was "unlikely that Coca-Cola will suffer greatly if the eleven-year relationship is continued for a short while. The two owners of [plaintiff] Roso-Lino, on the other hand, stand to lose their business forever." *Id.* The Court held that this caused the hardships to tip "rather heavily" in favor of granting a preliminary injunction. *Id.*

Similarly, in *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970), cited in Irmat's moving papers,[1] the Second Circuit affirmed a preliminary injunction granted to a Ford dealership enjoining defendant Ford from terminating plaintiff's dealership agreement during the pendency of the lawsuit. The court held that when the dire irreparable harm to the plaintiff was weighed against the "relatively small" harm to Ford in continuing the dealership *pendent lite*, the "imbalance of hardship" tipped "decidedly" toward the plaintiff. *Id.* at 1205.

---

[1] *See* ECF No. 15 at 9.

In the January 12 Order, the Court cited *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979) for the proposition that the "'balance of hardships' requirement would be superfluous if it could be met simply by virtue of making the already-required showing of irreparable harm." January 12 Order at 28.  However, *Buffalo Courier-Express* goes on to state that "***[t]here can be no doubt*** that if the [plaintiff] had shown a ***significant possibility that it would be driven out of business*** by the [defendant] in the period before a trial could be held the [balance of hardships] test would have been ***amply passed***." 601 F.2d at 58 (emphasis added).  *See also Aim Int'l Trading, L.L.C. v. Valcucine S.p.A.*, 2002 U.S. Dist. LEXIS 10373, at *19-20 (S.D.N.Y. June 11, 2002) (granting preliminary injunction and citing *Roso-Lino*, *Buffalo Courier-Express*, and *Semmes*).

Here, the application of *Roso-Lino*, *Semmes*, and *Buffalo Courier-Express* leaves little doubt that the balance of the hardships tips "decidedly" in favor of Irmat.  Irmat has not only shown irreparable harm; Irmat has made a virtually unopposed showing that termination from Optum's pharmacy network would result in catastrophic loss to Irmat and would likely drive Irmat out of business altogether.  *See* ECF No. 15 at 9-10; ECF No. 29 at 3-5.  The January 12 Order recognized this "existential threat to [Irmat's] business," and also noted that Optum "does not attempt to rebut Irmat's assertion that termination from Optum's network will result in dermatologists opting not to refer to Irmat altogether." January 12 Order at 7-8.

Optum, on the other hand, has failed to show that it would incur any significant hardship should a preliminary injunction ensue.  At the preliminary injunction hearing, the Court inquired as to why Optum could not "wait another three or four months" prior to termination.[2]  Optum failed to explain any significant harm that would be caused by such a delay:

---

[2] The current case management order requires this case to be trial-ready by July 20, 2016.  *See* ECF Nos. 36, 41.

6

> THE COURT: So why not wait another three or four months.
>
> MR. BERNSTEIN: I think it is disruptive to the network because other network providers that did go to the time and expense of getting Urac accreditation --
>
> THE COURT: My God, this is like a constitutional violation. It is disruptive to the network. Oh, my God, I am shaking in my boots when I hear that terrible disruption.

12/11/15 Hearing Transcript at 13.

The January 12 Order does not refer to the so-called "disruption," but notes that a preliminary injunction would "impose some hardship on Optum insofar as it would force Optum to bear risks related to Irmat acting as a mail-order pharmacy without the accreditations required by Optum for the purported purpose of patient safety." January 12 Order at 29. Any such "risks," however, are marginal if they exist at all. The pharmacy boards of *49 states and the District of Columbia* have licensed Irmat to dispense prescription drugs by mail. Optum only claims that it generally seeks to ensure proper dispensation of prescriptions requiring refrigeration or special handling, and to ensure network pharmacies can verify the identities of the persons receiving the mediation. As Irmat demonstrated in its motion papers, those are not serious concerns with respect to Irmat because Irmat ships via Federal Express (which employs excellent tracking and verification procedures) and virtually none of Irmat's mail-order sales require refrigeration or special handling. *See* Falah Reply Dec. ¶¶ 7-10.

Thus, the application of controlling Second Circuit law shows that the balance of hardships tips "decidedly" in Irmat's favor.

**III.    The Court erred by holding that the lack of an "Exhibit A" did not create sufficiently serious questions going to the merits of Irmat's breach of contract claim.**

The January 12 Order contains a substantial discussion of an issue that arose after the

briefing and during oral argument: the lack of "Exhibit A" to the 2015 Agreement.[3] Exhibit A, according to the plain terms of the 2015 Agreement, is a list of pharmacies that AccessHealth explicitly purports to bind to the agreement. It is a prominent document, referenced no less than *ten times* in the 2015 Agreement:

- "'Pharmacy' or 'Pharmacies' shall mean each or all the eligible pharmacy or pharmacies, pharmacy chains and/or pharmacy locations participating in the Administrator's network in accordance with the Agreement, addenda, exhibits, subsequent amendments, etc. and as specified on **Exhibit A**." § 1.30 (emphasis added).

- "[AccessHealth] represents and warrants that it has the authority to enter into this Agreement as the agent for and on behalf of each Pharmacy identified on **Exhibit A**." § 3 (emphasis added).

- "[AccessHealth] further represents and warrants that each Pharmacy identified on **Exhibit A** has agreed to be bound by and comply with all of the terms and conditions of this Agreement." § 3 (emphasis added).

- "[AccessHealth] represents and warrants to [Optum] that it has the legal authority to bind each Pharmacy identified on **Exhibit A** to provide Covered Prescription Services to Members." § 3.1 (emphasis added).

- "Pharmacies. Unless otherwise provided herein, [AccessHealth] shall provide [Optum] with credentialing information for each Pharmacy listed on **Exhibit A** to this Agreement." § 3.4.2 (emphasis added).

- "[AccessHealth] shall promptly notify [Optum] of any actual or pending termination or suspension in the operation of any Pharmacy location identified in **Exhibit A**." § 3.4.3 (emphasis added).

- "Company's Compliance Program. [AccessHealth] represents, warrants, and covenants that [AccessHealth] does and shall maintain a compliance monitoring program pursuant to which the Company, on no less frequently than an annual basis, verifies the licenses, insurance coverage, and any disciplinary actions (including but not limited to any debarment, exclusion, ineligibility, or conviction

---

[3]  On December 14, 2015, on a joint-telephone conference, Irmat requested leave to file a response to Optum's December 14, 2015 letter attaching "the data that makes up Exhibit A." Rather than address Irmat's request, the Court ordered Optum to, within 24 hours, file Exhibit A or an affidavit stating that Exhibit A did not exist. Accordingly, Irmat was never afforded an opportunity to respond to the McCreary Declaration (ECF No. 42) or address the issues implicated by the lack of "Exhibit A."

described in Section 3.4.7 of this Agreement) related to all Pharmacies listed on **Exhibit A**." § 3.4.6 (emphasis added).

- "[AccessHealth] monitors licenses, insurance, and disciplinary actions for all Pharmacies, Pharmacists-in-Charge, and owners for Pharmacies listed on **Exhibit A**." § 3.4.6 (emphasis added).

- "<u>Licenses and Permits</u>. Pharmacy shall obtain and maintain all federal, state and local approvals, licenses, accreditation, permits and certifications (collectively, 'Licenses') required to operate as a pharmacy at each location identified on **Exhibit A**." § 3.13.1 (emphasis added).

- "<u>340(B) Certification</u>. If [AccessHealth] is or becomes aware that any Pharmacy listed on **Exhibit A** during the term or any renewal term of this Agreement, is or becomes eligible to distribute Drug Products under the Public Health Service Act, Section 340(B) program, [AccessHealth] shall promptly provide [Optum] with written notice of such eligibility." § 11.13 (emphasis added).

Exhibit A, of course, does not exist. This creates massive ambiguity in the 2015 Agreement.[4] As the Court noted in its January 12 Order, "[a]ny interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." January 12 Order at 11 (quoting *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012)). By reading "Exhibit A" out of the agreement, however, the January 12 Order renders these ten provisions "superfluous or meaningless."

The Court also wrongly interpreted "the references to 'Exhibit A' in the Agreement to refer to those pharmacies (such as Irmat) in Chain Codes 605 and 630." In fact, the Chain Codes would be over-inclusive of the pharmacies bound by the Agreement. For example, Optum's

---

[4] Notably, Mr. McCready, admits that Exhibit A does not exist. McCready Decl. Para. 3. Rather, he states that it has been "the practice of the parties . . . throughout their relationship to rely on data sent to OptumRx by AccessHealth to identify the pharmacies participating in the AccessHealth PSAO and participating in the Optum Rx Pharmacy Network pursuant to contract." *Id.* But this explains nothing. The 2015 Agreement does not state that all pharmacies participating in AccessHealth are bound to the Agreement. Certainly, Optum and AccessHealth, as sophisticated parties, could have drafted the 2015 Agreement in that manner, but they did not. Rather, the 2015 Agreement states that only those pharmacies listed on the non-existent Exhibit A that participate in AccessHealth agreed to be bound to the 2015 Agreement.

2015 Pharmacy Manual notes that "Pharmacy locations that deliver Drug Products via Mailing, advertise Mailing or home delivery, must apply for a separate independent Mail Order Pharmacy Agreement." ECF No. 23-6 at 109. Thus, any such pharmacy enrolled with AccessHealth under Chain Codes 605 and 630 would, according to Optum, operate under a separate Mail Order Pharmacy Agreement and the 2015 Agreement would *not* apply. Presumably, such a pharmacy would not be included in Exhibit A.[5]

The ambiguity caused by the absence of Exhibit A creates, in the very least, serious questions of fact as to whether Irmat is legally bound to the Agreement. It is undisputed that AccessHealth knew that 80% of Irmat's business was from mail-order pharmacy services (*see* ECF 17¶ 45; 17-12), and it is undisputed that AccessHealth never provided Irmat with notice of the terms (or even the existence) of the 2015 Agreement. It is highly likely that AccessHealth (and Optum) knew that binding Irmat to the 2015 Agreement would be catastrophic to Irmat's business. Without the definitive document whose sole function is to explicitly identify the list of pharmacies AccessHealth purported to bind to the agreement, and without the benefit of discovery from, among other sources, AccessHealth, it was clear error for the Court to conclude that there were no sufficiently serious questions of fact going to the merits of Irmat's breach of contract claim to make them fair ground for litigation.[6]

---

[5] Additionally, Section 11.2 of the 2015 Agreement provides that the agreement, "*including . . . exhibits*" may only be amended by (a) unilateral amendment by Optum by providing 30 days prior written notice to AccessHealth; (b) by Optum and AccessHealth, after exchanging written notices and conferring in good faith; and (c) by a "dated written instrument" executed by Optum and AccessHealth. 2015 Agreement § 11.2(a)-(c) (emphasis added). The attachment to the McCreary does not meet any of these requirements.

[6] Agency law supports Irmat's position that AccessHealth did not have authority to bind Irmat to the 2015 Agreement. In light of the lack of an Exhibit A, the Court's finding that AccessHealth had actual authority to bind Irmat to the 2015 Agreement is in error. Moreover, the law demonstrates that AccessHealth had no apparent authority to bind Irmat to the 2015 Agreement. Under New York law, the creation of apparent authority is based entirely on the

10

## CONCLUSION

For the reasons set forth above, Irmat respectfully requests that the Court reconsider its December 16 and January 12 Orders and grant Irmat's Motion for a Preliminary Injunction.

Dated: New York, New York
February 1, 2016

**CONSTANTINE CANNON LLP**

By: _____/s/ Matthew L. Cantor_____
Matthew L. Cantor
David A. Scupp
Hamsa Mahendranathan
335 Madison Avenue
New York, New York 10017
(212) 350-2700

*Counsel for Park Irmat Drug Corp.*

---

"'*words or conduct of the principal, communicated to a third party*, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.'" *Flame Cut Steel Prods. Co., Inc. v. Performance Foams Coatings, Inc.*, 46 F. Supp. 2d 222, 228 (E.D.N.Y. 1999) (quoting *Hallock v. State*, 64 N.Y.2d 224, 231 (1984) (quoting *Ford v. Unity Hosp.*, 32 N.Y.2d 464, 473 (1973))) (emphasis added). The question of whether an agent had apparent authority to act on behalf of a principal, "'depends on a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal – not the agent.'" *Id*. A third party may rely on the appearance of authority "'only to the extent that such reliance is *reasonable*.'" *Id.* (emphasis added). Critically, apparent authority "cannot be established by the actions or representations of the agent." *Minskoff v. Am. Express Travel Servs.*, 98 F.3d 703, 708 (2d Cir. 1996). Here, there is no indication that *Irmat* engaged in any conduct toward Optum from which Optum could have *reasonably* believed Irmat had conferred authority on AccessHealth to bind Irmat to a contract that could wipe out 80% of Irmat's business. AccessHealth therefore had no apparent authority to bind Irmat to the 2015 Agreement.

11